

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00046-CR

| | | |
|---|---|---|
| Glennie Darnell Jennings | § | From the 371st District Court |
| | § | of Tarrant County (1236163D) |
| v. | § | December 28, 2012 |
| | § | Opinion by Chief Justice Livingston |
| The State of Texas | § | (nfp) |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS

By_____
Chief Justice Terrie Livingston



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 02-12-00046-CR**

GLENNIE DARNELL JENNINGS                                    APPELLANT

V.

THE STATE OF TEXAS                                              STATE

----------

FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

In his only point, appellant Glennie Darnell Jennings argues that the evidence is insufficient to support his conviction for indecency with a child by contact.[2] We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. Penal Code Ann. § 21.11(a)(1) (West 2011).

**Background Facts**

In 2011, a grand jury indicted appellant with aggravated sexual assault of a child. Appellant's indictment alleged that he had knowingly caused the penetration of the female sexual organ of a child who was younger than fourteen years old. Appellant pled not guilty. During the trial, appellant's counsel asked the trial court to include in the jury charge a question about indecency with a child by contact as a lesser-included offense.[3] The trial court granted this request. After hearing evidence and arguments from the parties, the jury convicted appellant of indecency with a child by contact. The jury then listened to appellant testify in the punishment phase of his trial and assessed seventeen years' confinement. The trial court sentenced appellant accordingly, and he brought this appeal.

**Evidentiary Sufficiency**

Appellant contends only that the evidence is insufficient to support his conviction. In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Wise v. State*, 364 S.W.3d 900,

---

[3]The court of criminal appeals has held that "indecency with a child is a lesser-included offense of aggravated sexual assault of a child when both offenses are predicated on the same act." *Evans v. State*, 299 S.W.3d 138, 143 (Tex. Crim. App. 2009).

903 (Tex. Crim. App. 2012). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Blackman v. State*, 350 S.W.3d 588, 595 (Tex. Crim. App. 2011).

To obtain a conviction for indecency with a child by contact under the facts of this case, the State was required to prove that with the intent to arouse or gratify the sexual desire of any person, appellant touched any part of a child's genitals. *See* Tex. Penal Code Ann. § 21.11(a)(1), (c)(1); *Connell v. State*, 233 S.W.3d 460, 465–66 (Tex. App.—Fort Worth 2007, no pet.) (mem. op.). "A complainant's testimony alone is sufficient to support a conviction for indecency with a child." *Connell*, 233 S.W.3d at 466; *see Bazanes v. State*, 310 S.W.3d 32, 40 (Tex. App.—Fort Worth 2010, pet. ref'd) (citing *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. [Panel Op.] 1978)). Also, "the jury is free to accept or reject any or all of the evidence of either party, and any or all of the testimony of any witness." *Franklin v. State*, 193 S.W.3d 616, 620 (Tex. App.—Fort Worth 2006, no pet.) (citing *Hernandez v. State*, 161 S.W.3d 491, 500 (Tex. Crim. App. 2005)).

The record contains testimony from several witnesses, including the victim, supporting the jury's finding of appellant's guilt. Specifically, the evidence shows that Erica and Kevin, who are married, have one child together, Quintessa, who

4

was born in April 2007 and was four years old during the trial.[4]  In 2008, Erica, Kevin, and Quintessa lived in an Arlington apartment complex, and appellant lived next door.  They all became friendly with each other; appellant occasionally played games, watched television, and smoked marijuana with Erica and Kevin, and appellant also developed a relationship with Quintessa, who referred to him as her "grandfather."[5]  According to Kevin, appellant saw him, Erica, and Quintessa two to three times a week, and appellant often gave Quintessa toys or candy.[6]  Erica, Kevin, and Quintessa eventually moved to a different apartment, but they maintained contact with appellant.  Appellant came over to the apartment only upon an invitation.

According to Erica and Kevin, on the evening of November 3, 2010, appellant planned to come to the apartment to play dominos.  Although Quintessa was normally excited when appellant came over, according to Kevin, she was not happy about his coming there that day.  In fact, Kevin testified that when Quintessa learned that appellant was coming that evening, she "was pretty

---

[4]To protect the identity of the victim, we will refer to some of the witnesses by using pseudonyms.  *See McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

[5]Erica said that appellant never had duties to care for Quintessa or to potty train her, but she testified that sometimes, appellant played with Quintessa, had her sit on his lap, bounced her, and read her books.

[6]Erica testified that kids often went to appellant's apartment because he gave them toys and snacks.

5

distraught." After appellant arrived, Quintessa did not speak to him like she usually had.

Later on that night, according to Erica, Quintessa went to use the restroom and stayed there for an extended period of time. Erica stopped playing dominos to check on Quintessa, and in the bathroom, Erica saw Quintessa "with her pants down around her ankles trying to look at . . . her bottom area." Erica asked Quintessa what was wrong, and Quintessa said that her "butt hurt." While gesturing with her hands to her front genital area and her bottom, Quintessa then told Erica that appellant had "put his finger in her pee and in her butt." Erica called Kevin to the restroom, and Quintessa told him what she had said to Erica. Kevin was "beyond mad," but Erica asked him to not confront appellant with what Quintessa had said. Kevin asked appellant to leave. According to Kevin, after appellant left, Kevin, Erica, and Quintessa cried together.

Erica testified that a couple of days later, she told Quintessa's pediatrician, Dr. Victor Diaz de Leon, about what had occurred. Erica and Kevin each testified that Quintessa also told Dr. Diaz de Leon about what she had previously said to Erica and Kevin. According to Erica and Kevin, Dr. Diaz de Leon told them to take Quintessa to a children's hospital, and they did so.

Rebecca Sullivan, a forensic nurse, testified that she met Quintessa at Cook Children's Medical Center on November 6, 2010. Quintessa told Sullivan that appellant had put "his finger in [Quintessa's] butt and [her] pee," and Quintessa later clarified for Sullivan that her "pee" meant her genitalia.

6

Quintessa told Sullivan that when appellant did this, Quintessa felt "nasty and not good." Sullivan testified that she did not find anything unusual upon physically examining Quintessa (such as signs of trauma on her hymen or anal region), but Sullivan said that "most children that are sexually abused will have a normal exam." Sullivan testified that based on statements made by some children in examinations, she may believe that they have been coached, but that Quintessa's statements to her on the date of the examination did not raise any such "red flags."

Quintessa later participated in an interview with a child forensic interviewer, Carrie Paschall. During the interview, which lasted nearly thirty minutes, Quintessa was, according to Paschall, very active and chatty. Quintessa provided several "sensory details" about what had occurred with appellant, which signified to Paschall that Quintessa could have been "reporting something from a memory . . . versus parroting back something [she had] been told to repeat." Quintessa told Paschall that appellant had touched her on the inside of her private part while they were behind a couch and that this touching had hurt her. Quintessa said to Paschall that during this incident, her mother was cooking in the kitchen and her father was cleaning. Paschall did not sense "red flags" about Quintessa's truthfulness during the interview.[7] Donna Hubbard, an Arlington police detective, watched the interview, spoke to Erica, and

---

[7]Paschall conceded at trial, however, that there is no definitive way to determine whether a child is truthful.

7

prepared appellant's arrest warrant. At trial, Quintessa testified that appellant had put his finger on the outside of her "pee," which was the place she used "[f]or going potty."

Despite these facts, appellant contends that the evidence is insufficient to support his conviction because "virtually . . . all the essential testimony was inconsistent with other testimony on the same subject." Appellant also asserts that the evidence is insufficient because it shows that he lacked access to Quintessa. Essentially, appellant argues that the record contains too many facts that are inconsistent with his guilt.

It is true that certain witnesses' testimony produced inconsistencies, including some contradictions that were seemingly only tangentially related to the issue of appellant's sexual contact with Quintessa. It is also true that some evidence, if given credence by the jury, could have weighed against a finding of guilt. For example, Quintessa told Paschall near the time of the offense that appellant had touched her behind a couch, that the touching had hurt her, and that at the time of the offense, her mother was cooking in the kitchen and her father was cleaning. At trial, however, Quintessa testified that it did not hurt when appellant touched her and that while he was touching her, she was in a bathroom, Erica was getting a drink, and Kevin was sitting in a chair. Quintessa also stated at one point in her testimony, contrary to Paschall's account of their conversation, that appellant did not touch her "butt." Quintessa testified that appellant had touched her "pee" on the same night that she had told her parents

what had happened.  But Erica testified that the incident described by Quintessa could not have happened on that night because Quintessa had been "right next to [Erica] when [appellant] was there."  Quintessa testified that Kevin, Erica, and appellant did not smoke around her, but Erica said that she, Kevin, and appellant smoked marijuana while Quintessa was in a play area that was essentially in the same room that they were in.

Detective Hubbard, who had investigated close to a thousand cases concerning children, testified that it is not uncommon for young children to change the details about an offense a year or two years after the offense occurs.  Paschall, who teaches courses on how to properly interview children, indicated that preschool children can recall who committed an act and what happened but have more difficulty recalling when the act occurred.  Although Paschall said that she would expect a child's memory of the details of an offense to fade over time, she testified that she would not typically expect the location of the offense to change.  She later testified, however, that "over a long period of time for a young child, you would expect to see some inconsistencies in the details surrounding the major event."  Paschall also testified that it is possible that a child could confuse where an offense occurred with where the child told others about the offense.

Cody Adams, an Arlington police officer, testified that in November 2010, he went to the children's hospital to meet with Quintessa and her parents.  According to Officer Adams, the parents, who were "heartbroken," told him that

9

after Quintessa had told them about what had occurred with appellant, they went back into the living room to finish their game of dominos. When Erica testified, she denied having finished the game, and she stated that she did not remember telling Officer Adams that she had finished it. Kevin also testified that he did not remember making that statement. Officer Adams conceded that the parents' statement that they "finished" the game could have meant only that the game ended upon Quintessa's outcry.

Erica testified that appellant had a hard time walking, was diabetic, and sometimes needed help standing up. Kevin testified, however, that although appellant did not walk long distances, he "move[d] around a lot." Erica stated that "[f]or the most part," she was near Quintessa when appellant was near her, but Erica also testified that there were times that she was not in the apartment while appellant was near Quintessa. According to Erica, most of the time when appellant came to her apartment, he would simply go somewhere and sit down. Also, Erica testified that she would not have allowed appellant to go near the bathroom while Quintessa was in there, and Kevin testified that appellant did not go to the bathroom with Quintessa. But at one point during the cross-examination of Kevin by appellant's counsel, the following exchange occurred:

> Q. Let's just cut to the chase on this. If your wife was cooking dinner in the kitchen and somebody had the guts to walk into your house, pull your daughter's pants and panties down, and digitally penetrate her anally and vaginally behind that couch, somebody would have known, right?
>
> A. You said what?

10

Q. Somebody would have known, right?

A. No. Like I said, obviously not. If they are behind the couch where I cannot see everything that's going on, how can I say for sure that he did not do anything. I cannot say for sure he did not do anything.

Dr. Diaz de Leon testified that his appointment with Quintessa in the first week of November 2010 concerned coughing and a runny nose and that at the end of the appointment, he was asked about what to do with a child that might have been molested. Dr. Diaz de Leon stated, however, that he did not remember hearing a specific allegation of sexual abuse, and he said that if such an allegation had been made, he would have documented it in his records. Quintessa, Erica, and Kevin each testified that Quintessa had told Dr. Diaz de Leon about what appellant had done.

In her investigation, Detective Hubbard collected several pairs of panties that Quintessa might have worn on the day of the offense, and she sent those panties to the medical examiner's office for a DNA analysis. Constance Patton, a forensic biologist, testified that she had examined four pairs of Quintessa's panties that Detective Hubbard had collected, that each pair contained the same male's DNA profile, and that none of them matched appellant's DNA. Patton said that she had no opinion about which male's DNA was on the panties or about how the DNA got there. On cross-examination by the State, Patton explained that the exclusion of appellant's DNA inside Quintessa's panties did not negate the possibility that he touched her sexual organ. Patton testified that "the most

11

likely scenario [was] that [the male's DNA] was from inadvertent contact from someone." Kevin stated that he had helped Quintessa get dressed in mornings and that he had therefore touched her panties.

Finally, appellant's son, Phyllip Scott, testified that the allegations against appellant were "completely ludicrous," that he did not "have too many good thoughts" about Erica and Kevin, that he never saw odd behavior between appellant and Quintessa, and that he had never heard other allegations of inappropriate sexual conduct by appellant.

Although the facts stated above could have caused a hypothetical jury to question the credibility or weight of the evidence supporting appellant's guilt, it is evident that the jury in this case did not do so because it convicted appellant. *See Castillo v. State*, No. 08-08-00332-CR, 2010 WL 4117674, at *4 (Tex. App.—El Paso Oct. 20, 2010, no pet.) (not designated for publication) ("In finding Appellant guilty of the charged offenses, the jury implicitly resolved the conflicts [in the evidence] in favor of conviction."); *Denman v. State*, 193 S.W.3d 129, 132–33 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (holding that the jury's conviction established its implicit rejection of the defendant's self-defense theory). Rather, by convicting appellant, the jury signaled that it believed enough of Quintessa's outcry[8] or her testimony that it resolved the critical issue in

---

[8]Outcry evidence, even if inconsistent with testimony at trial, has probative value in our evidentiary sufficiency review. *See Rodriguez v. State*, 819 S.W.2d 871, 873 (Tex. Crim. App. 1991); *Bermudez v. State*, 878 S.W.2d 227, 229 (Tex. App.—Corpus Christi 1994, no pet.); *see also Kimberlin v. State*, 877 S.W.2d

12

appellant's case, which was whether he touched her genitals, in favor of the State.[9] The jury was the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Wise*, 364 S.W.3d at 903. In performing our evidentiary sufficiency review, therefore, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the jury. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we must determine whether the necessary inferences of appellant's guilt are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *See Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011). We must presume that the jury resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Wise*, 364 S.W.3d at 903.

Viewing the evidence summarized above in the light most favorable to the verdict, deferring to the jury's implicit resolution of conflicts in the evidence, and acknowledging that the jury was free to accept or reject any part of the testimony of any witness, we hold that the jury could have rationally found the essential

---

828, 831 (Tex. App.—Fort Worth 1994, pet. ref'd) ("A child victim's outcry statement alone can be sufficient to sustain a conviction . . . .").

[9]Appellant does not contend that there are facts in the record by which the jury could have found that he touched Quintessa's genitals without the intent to arouse or gratify someone's sexual desire. *See* Tex. Penal Code Ann. § 21.11(a)(1), (c)(1).

elements of indecency with a child by contact beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Wise*, 364 S.W.3d at 903; *cf. Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) ("The jury observed the complainant's demeanor and was entitled not only to reconcile any . . . conflicts, but even to disbelieve her recantation.").  Thus, we hold that the evidence is sufficient to support appellant's conviction, and we overrule appellant's sole point.

## Conclusion

Having overruled appellant's point, we affirm the trial court's judgment.


TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and WALKER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  December 28, 2012