

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. PD-0109-10

**JAMES BLACKMAN, Appellant**

**v.**

**THE STATE OF TEXAS**

**ON STATE'S PETITION FOR DISCRETIONARY REVIEW
FROM THE FIRST COURT OF APPEALS
HARRIS COUNTY**

HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., PRICE, WOMACK, JOHNSON, KEASLER and COCHRAN, JJ., joined. MEYERS, J., filed a dissenting opinion.

## O P I N I O N

A jury convicted appellant of possessing with intent to deliver a controlled substance (three kilograms of cocaine with a street value of about $300,000). This cocaine was found behind the seat of the driver of a van in which appellant was a front-seat passenger. We exercised our discretionary authority to review the court of appeals's 2-1 decision that the evidence is legally insufficient to support the possession element of this offense. *See Blackman v. State*, No. 01-08-00138-CR, slip op. at 27 (Tex.App.–Houston [1ˢᵗ Dist.], delivered December 22, 2009) (State failed to prove beyond

a reasonable doubt "that appellant exercised knowingly actual care, custody, control, or management over the cocaine") and at 29 (no evidence that appellant was a party to the van-driver's possession of the cocaine).[1]  We will reverse.

The evidence shows that experienced Pasadena Police Department narcotics investigators were conducting surveillance late at night at a Super 8 Motel just off Interstate 10 when they noticed three men (Gordon, Ayala-Garcia, and appellant) arrive together at the motel in a mini-van with North Carolina license plates.[2]  The van had been rented in St. Petersburg, Florida, from where the three men had traveled hundreds of miles together to the Super 8 Motel in Pasadena.  Testimony was presented through officers conducting the surveillance that the Houston/Pasadena area is a hub or corridor for narcotics trafficking along Interstate 10 east and west, that narcotics traffickers commonly come from Florida via Interstate 10 to the Houston/Pasadena area to purchase narcotics, and that narcotics traffickers commonly use rented vehicles on these trips because rented vehicles are not subject to forfeiture if the traffickers are caught.  The officers ended their surveillance at the Super 8 Motel later that night once they "were comfortable the occupants of the van and the van

---

[1]

The ground upon which we granted discretionary review states:

Is the link evidence sufficient to establish that appellant exercised care, custody, control, or management over the cocaine, and had knowledge that the substance was contraband when the evidence shows that appellant arrived in Houston from Florida with two other men and exhibited a comfortable familiarity with the men, was present when a transaction for three kilograms of cocaine took place, and experts testified that appellant's behavior was consistent with a large-scale narcotics operation?

[2]

The record is silent on why the narcotics investigators were conducting surveillance of that motel at that particular time.

were not going to leave for that evening [sic]."[3]

The next morning, several narcotics officers in different locations continued surveillance of the three men at the motel. A narcotics investigator (Neilon) described the surveillance as a "rolling" surveillance, during which it was not possible to see what appellant and the other two men were doing at all times.

> Q. [STATE]: In talking to the jury about how you're talking about reestablishing your surveillance and how you perform your surveillance, what techniques do you use to try and disguise your surveillance vehicles?
>
> A. [NEILON]: Lots of times when we do what we call a rolling surveillance, so it's not always one person that's directly in visual contact. There's always somebody else, but you may turn down a street and have to loop around the block or–and especially once they stop, you may have to go around the block to try to get a better vantage point where people are sitting and seeing through trees or trucks may pull up and block your view. So, you know, there's constant movement a lot of the times when out on surveillance. So, sometimes I may have an eye, physical eye on people for an hour, sometimes it may be five minutes and then somebody will do it. So, we reposition ourselves as we have to be very fluid with traffic.

Neilon observed the men load their luggage into the van, and drive away together in the van after checking out of the motel with Gordon driving, appellant in the front passenger seat and Ayala-Garcia in the rear passenger seat behind appellant. Neilon testified that he did not see appellant "in

---

[3] Although one could reasonably infer from the evidence that the three men checked into the motel for the night, the record is not entirely clear on whether they shared a room or whether they each rented a separate room. One of the narcotics investigators testified that "the hotel room" was not in appellant's name.

> Q. What did you do?
>
> A. We contacted the hotel manager and found out who checked in that night.
>
> Q. Okay. Was the hotel room in Mr. Blackman's name?
>
> A. No, sir.

that van in anyplace other than the front passenger's seat" at any point during that day "when the van was rolling or moving." From the motel, the three men traveled together in the van to a tire shop to have one of the tires on the van repaired. They kind of mingled around, and "[a]ll three of them talked on cellphones kind of just back and forth together around the area of the tire shop" no further than "five to ten" feet apart at the most.

From the tire shop, the three men traveled together in the van to a "small ... hand car wash" where "[y]ou put coins in and use the wand to spray your car after." The men payed two males loitering around the parking lot to wash the van. While these two males washed the van, appellant and the other two men from the van were using their cellphones and "standing around in a group walking back and forth just kind of hanging around like waiting on something." After this, the van was taken to the vacuums and appellant and the others unloaded the luggage from the van, never leaving it unattended while the van was being vacuumed by the same two males who had washed it. The washing and the vacuuming of the van took about 45 minutes.

After the vacuuming was done and the luggage was loaded back up, the three men traveled together in the van to a clothing store, where they went inside and stayed for about ten to fifteen minutes. From the clothing store, they traveled together in the van back to the car wash, where they parked in one of the stalls and sat together in the van with the engine running for about 20 to 25 minutes. Neilon then saw the van pull out of the stall closer to the street, where appellant and the others sat in the van for another 20 to 25 minutes.

Neilon then saw a green Toyota Camry pull up in front of the van in the street in the right-hand lane and stop. The Toyota began to drive away with the van following it. Neilon described the Toyota and the van as "bumper locking, meaning less than a car length between the two of them."

The Toyota and the van eventually parked in a residential neighborhood with the Toyota parked in front of the van. Neilon observed appellant get out of the van, walk to the back, open the hatch, and reach into the van with both arms to retrieve something while the driver of the Toyota and the driver of the van (Gordon) walked together toward the back of the van where appellant was.[4]

Neilon lost sight of the van at this time. About two to four minutes later, Neilon reestablished surveillance of the van at which time he noticed that the van was parked on the other side of the street and the Toyota was gone. About 15 to 20 minutes later, the Toyota reappeared and Neilon observed the Toyota and the van being driven to another location in the neighborhood very close to where they had been before and park. The driver of the Toyota got out, walked to the driver's side window of the van, and passed a box through the driver's side window to Gordon. Gordon and the Toyota driver shook hands and the van left.

Q. [STATE]: Okay. What do you see happen next?

A. [NEILON]: At that point in time, I slowed down and advised them once the surveillance team where I saw the vehicle turn and what direction as I'm coming through once again the brakes, the trees and where that house used to be [sic]. I can observe the male and [sic] the Toyota exiting carrying a box of some type with both hands. As I get down here to the intersection, I see him pass the box into the window of the van in to the driver, Mr. Gordon and him shake hands; and he turns and begins

---

[4] On cross-examination, the defense sought to impeach Neilon with a report prepared by another narcotics investigator (Williams). This report did not state that Neilon "saw [appellant] attempt to retrieve something" from the back of the van. It stated that Neilon "simply saw [appellant] standing in the back rear end of the van." Neilon continued to maintain on cross-examination that he saw appellant "retrieving something" from the back of the van. In its response to appellant's motion for directed verdict, the State suggested that appellant was retrieving the money to purchase the cocaine, "Then the defendant well, he first goes to the back to as the individual in the Toyota, goes to the back of the car and you see him reaching for something. There is no money found in the van ultimately. And obviously, that cocaine cost a lot of money." An experienced narcotics investigator (Kelly) testified that, in a typical narcotics transaction, "the person who is selling the cocaine [will] want to see the money first."

to walk off. At that point in time, I am too far down the street.[5]

A marked patrol unit began to follow the van and soon stopped it for a traffic violation. Gordon was driving, appellant was in the front passenger seat, and Ayala-Garcia was in the back seat behind appellant. Behind the driver's seat, the police found a shoe box with a blanket on top of it. The shoe box contained the three kilograms of cocaine.[6] Appellant was the only person in the van with a large amount of cash ($637) on his person. The police also seized from the driver's-side sun visor of the van what purported to be an invitation to "Wright's and Smith Annual Family Reunion in Texas." This invitation, however, contained no time, date or location for this family reunion. The police also seized from the dashboard of the van a Bible with a name embossed on it that did not match anyone in the van. A narcotics investigator (Williams) characterized the family-reunion invitation and the Bible as the types of props that narcotics traffickers commonly use in an attempt

---

[5] Neilon later testified that he did not see who in the van received the package through the driver's-side window.

> Q. [DEFENSE]: Okay. Well, let me clear it up. What did you see the Toyota driver do?
>
> A. [NEILON]: As they parked that second, the third time?
>
> Q. Yes, sir, with the package.
>
> A. Okay. He exited his vehicle, walked back to the van and passed it through the driver's side window of the van.
>
> Q. When you said through it, does that mean he passed it to the driver?
>
> A. I did not see who received it in the van. He stuck it through the window, the open window of the van.

[6] Neilon testified that the package he saw the Toyota driver pass through the driver's-side window of the van was approximately the size of the shoe box.

to disguise their activities.  Neilon testified, based on his training and experience in investigating narcotics cases, that appellant and the others behaved throughout the day like narcotic traffickers.[7]

The defense suggested that appellant was merely an innocent bystander to the narcotics transaction between Gordon (the driver of the van) and the driver of the Toyota.  Kelly testified, however, that narcotics traffickers do not usually bring innocent-bystander witnesses to "large scale narcotics transactions."

> Q. [STATE]: Let me ask you this question: And is it common or uncommon in large scale narcotics transactions for drug purchase, or drug dealers to include other witnesses that are not involved in the deal?
>
> A. [KELLY]: No, not that I have seen.
>
> Q. And why is that?
>
> A. It's–if they wanted to exclude them, in my opinion, they want to exclude a person from their transaction, they are going to remove themselves.  They don't want them to know what's going on.  That way they can't say oh, well, I didn't know what was going on.  When standing right beside you and you're talking about the deal, you can't say hey, I didn't know what was going on.  If he is around the corner, around the bend or whatever and comes back and then something happens, then you can say well, I didn't know what was going on.  But in this particular case–
>
> Q. No.  I am just talking in general.
>
> A. Okay.
>
> Q. Is it common whether or not you invite witnesses?

---

[7] Neilon testified:

> Q. [STATE]: How would you describe their behavior based on your training and experience throughout the day?
>
> A. [NEILON]: It was consistent with the many of the other surveillance we had done involving narcotic transactions.

A. No.

* * *

Q. Is it common or uncommon for the person committing the crime to create other witnesses to the crime or involve other witnesses?

A. Is it common for him to involve other witnesses, no.

During its closing jury arguments, the defense claimed that the State did not prove beyond a reasonable doubt that appellant "either put [the cocaine] in his car or was aware of it" or that he "aided, assisted and encouraged" any of the others to commit the offense.[8]  The State claimed that this defied common sense.

> [STATE]: Ladies and gentlemen, I anticipate the defense in this case will be one that the defendant was merely present at the scene, that he didn't assist in this transaction. But I am going to ask you to look at the evidence and ask not to look at each one of these facts and ask you to look at the totality and see how it all fits together.
> * * *
> I want to talk to you briefly about what beyond a reasonable doubt is.  Beyond a reasonable doubt is you use your common sense in applying the facts in the case, okay.  It's not looking at each individual fact in a vacuum.  It's looking at everything together.  And when you look at everything together, you've got three men coming in and [sic] rented car from a foreign town, spending all of their time together, doing

---

[8]
The application paragraph in the jury charge authorized appellant's conviction either as a principal or as a party.

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 15th day of June, 2007, in Harris County, Texas, the defendant, James Blackman, did then and there unlawfully, knowingly possess with intent to deliver a controlled substance, namely, cocaine, weighing at least 400 grams by aggregate weight, including any adulterants or dilutants; or if you find from the evidence beyond a reasonable doubt that on or about the 15th day of June, 2007, in Harris County, Texas, James Gordon and/or Mauro Ayala-Garcia, did then and there unlawfully, knowingly possess with intent to deliver a controlled substance, namely, cocaine, weighing at least 400 grams by aggregate weight, including any adulterants or dilutants, and that the defendant, James Blackman, with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid James Gordon and/or Mauro Ayala-Garcia, to commit the offense, if he did, then you will find the defendant guilty as charged in the indictment.

every activity the night before together, doing every activity the next day together in close proximity. But accidentally, when it comes to an illegal transaction, suddenly when it comes to drugs, James Blackman has blinders on.

* * *

Let's step back, be objective, play common sense. I told y'all in voir dire about common sense. That was the key to this whole case. And let's think about when looking at the evidence, let's think about hypotheticals that were posed and juries with the glasses. Did the person have knowledge of it? Did they have possession? Without knowledge, you can't possess it. Okay. Fair enough.

Let's start from the back. Let's start from the traffic stop, okay. We have three individuals stopped in a van. We have approximately $300,000 worth of cocaine in the van. You remember what I asked y'all in applying common sense? Do crooks invite other witnesses to crimes? Does that make sense? Absolutely not.

The court of appeals's majority opinion decided that "the evidence presented by the State linked only Gordon [the driver] to the box containing the cocaine"[9] and that the State's case against appellant "rests entirely on appellant's presence in the van." *See Blackman*, slip op. at 19, 24. While acknowledging that appellant's "presence in a van with a shoe box containing three kilograms of cocaine may be highly suspicious," the court of appeals decided that the "State presented no evidence that appellant voluntarily engaged in conduct that he possessed cocaine found in the shoe box on the floorboard behind the driver's seat in the van" and that "[e]ven when viewed together in the light most favorable to the verdict, the factors relied upon by the State do not create the logical force necessary to allow a rational juror to find, beyond a reasonable doubt, that appellant exercised knowingly actual care, custody, control, or management over the cocaine." *See Blackman*, slip op. at 26-27 (internal quotes omitted). The court of appeals further decided that:

> Nor is there any evidence that appellant in any way aided or assisted Gordon in obtaining the box containing the cocaine or in exercising control over the box.

---

9

Thus, it would appear that the court of appeals decided that only Gordon was guilty of possessing the cocaine.

> Again, it is well-settled law that mere presence, even with knowledge of an offense, does not make one a principal or a party to the offense. Considering the evidence of what appellant did before, during, and after the cocaine was handed to Gordon, even assuming that appellant knew that the shoe box contained cocaine, there is no evidence that appellant was a participant in the transaction. Here, the State proved that appellant rode as a passenger in a rented van from Florida to Texas; stayed the night in a motel and rode to a car wash and a clothing store with Gordon and Ayala-Garcia; waited at the car wash in the van with the others for forty to fifty minutes after it had already been washed; rode with the others in the van to a residential neighborhood; talked on his cell phone; walked towards the back of the van at the same time as Gordon and the driver of the Toyota were walking by the side of the van; and sat in the van when the driver of the Toyota handed Gordon the shoe box containing cocaine. Appellant's behavior was essentially passive, not active. The State presented no evidence that appellant voluntarily engaged in conduct demonstrating that he, with the intent to promote or assist Gordon in the commission of the offense of possession of cocaine, did anything to solicit, encourage, direct, aid or attempt to aid Gordon in committing the offense. Viewing the evidence in the light most favorable to the verdict, there is no evidence that appellant was a party to Gordon's possession of the cocaine.

*See Blackman*, slip op. at 28-29 (citation to authorities omitted).

To prove the unlawful-possession-of-a-controlled-substance element of the charged offense in this case, the State was required to prove that: 1) appellant exercised control, management, or care over the three kilograms of cocaine; and 2) appellant knew that this was cocaine. *See Poindexter v. State*, 153 S.W.3d 402, 405 (Tex.Cr.App. 2005). Moreover, since appellant was not in exclusive possession of the van, the State was also required to prove beyond a reasonable doubt that appellant's connection to the three kilograms of cocaine "was more than just fortuitous." *See Poindexter*, 153 S.W.3d at 406 (internal quotes omitted). This is the "affirmative links" rule, which we described in *Poindexter*:

> The "affirmative links rule" is designed to protect the innocent bystander from conviction based solely upon his fortuitous proximity to someone else's drugs. This rule simply restates the common-sense notion that a person–such as a father, son, spouse, roommate, or friend–may jointly possess property like a house but not necessarily jointly possess the contraband found in that house. Thus, we have

formulated the rule that "[w]hen the accused is not in exclusive possession of the place where the substance is found, it cannot be concluded that the accused had knowledge of and control over the contraband unless there are additional independent facts and circumstances which affirmatively link the accused to the contraband."

*See id*. (footnotes and citations to authority omitted).

In determining whether the evidence is legally sufficient to support a conviction, a reviewing court should not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (internal quotes omitted and emphasis in original). Instead, the reviewing court must view all of the evidence in the light most favorable to the verdict and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See id*. (emphasis in original); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Cr.App. 2007). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *See Jackson*, 443 U.S. at 319; *Gold v. State*, 736 S.W.2d 685, 692 (Tex.Cr.App. 1987) (Teague, J., dissenting) ("For [an intermediate court] to conclude . . . that a jury verdict is supported by sufficient evidence, the court must determine whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial . . . and as a matter of law satisfy the proof and burden requirement for every element of the crime charged.") (internal quotes omitted). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *See Hooper*, 214 S.W.3d at 13. The prosecution has no affirmative duty to "rule out every hypothesis except that of guilt." *See Wright v. West*, 505 U.S.

277, 296 (1992) (internal quotes omitted); *Jackson*, 443 U.S. at 326.

We believe that the court of appeals misapplied the *Jackson v. Virginia* standard by asking itself whether it believed that the evidence is sufficient to support appellant's guilt instead of asking whether a rational trier of fact could have found appellant guilty beyond a reasonable doubt.[10] And we think it clear that, under a proper application of the *Jackson v. Virginia* standard, a rational trier of fact could have found appellant guilty beyond a reasonable doubt. A jury could reasonably find that appellant and the other two men traveled hundreds of miles together for the common purpose of purchasing three kilograms of cocaine. Their behavior during the time that they were under surveillance by the police, during which they did practically everything together, was consistent with this purpose. A jury could reasonably find that Gordon would not bring two innocent-bystander witnesses hundreds of miles to a large-scale narcotics transaction. A jury could also reasonably rely on the opinion of an experienced narcotics investigator that appellant and the other two men acted like narcotics traffickers. These "independent facts and circumstances" affirmatively link appellant to the contraband. *See Poindexter*, 153 S.W.3d at 406. A jury could reasonably find beyond a reasonable doubt that appellant's connection to the three kilograms of cocaine was much more than just a fortuitous accident. *See id.*

---

[10] It appears that the court of appeals applied a thirteenth-juror, evidentiary-weight standard, which was never the law in Texas even before this Court's decision in *Brooks*. *See Brooks v. State*, 323 S.W.3d 893, 898-902 (Tex.Cr.App. 2010) (discussing the indistinguishable "legal-sufficiency" and "factual-sufficiency" standards, which are very different from an "evidentiary-weight" standard that permits a reviewing court to sit as a thirteenth juror and to disagree with a jury's resolution of conflicting evidence and with a jury's weighing of the evidence).

The judgment of the court of appeals is reversed, and the case is remanded there for further proceedings not inconsistent with this opinion.

Hervey, J.

Delivered: April 13, 2011
Publish