

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00120-CR

JOSHUA SHAMAR
SNEED A/K/A JOSHUA
S SNEED

APPELLANT

V.

THE STATE OF TEXAS

STATE

------------

FROM THE 372ND DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

In two issues, Appellant Joshua Shamar Sneed a/k/a Joshua S Sneed appeals his conviction of two counts of aggravated robbery with a deadly weapon. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Procedural Background

A jury found Sneed guilty of the aggravated robbery of Horacio Martinez and Humberto Lopez while using or exhibiting a deadly weapon (a firearm) on or around March 15, 2011, and assessed his punishment at eight years' confinement on each count. *See* Tex. Penal Code Ann. § 29.03(a)(2) (West 2011). The trial court rendered judgments accordingly, and this appeal followed.

## III. Sufficiency of the Evidence

In his first issue, Sneed argues that the trial court erred by denying his motion for an instructed verdict because there was insufficient evidence to identify him as the perpetrator.

A challenge to the denial of a motion for instructed verdict is actually a challenge to the sufficiency of the evidence. *Canales v. State*, 98 S.W.3d 690, 693 (Tex. Crim. App.), *cert. denied*, 540 U.S. 1051 (2003). In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012).

### A. Evidence

Lopez and Martinez testified that on March 15, 2011, they had arranged to meet at a car wash about a car that Martinez had posted for sale. Martinez said

that the area was well-lighted from the car wash's lights, traffic lights, and cars driving by with their lights on.

While Martinez waited for Lopez to arrive, he saw three or four people near the apartments behind the car wash; one of them crossed the street to the gas station. Martinez said that the person who crossed the street was wearing blue "sporty-type" shorts and a black hooded sweatshirt, had a dark complexion, and wore his hair in a "ponytail on top." He later identified that person as Sneed.

Lopez arrived, decided to buy the car, and sent his brother to get the money for it. Lopez and Martinez waited at the car wash, standing outside the car, for around fifteen minutes. During that time, a man approached with a pistol in his hand, pointed it at Martinez and Lopez, and demanded their money and cell phones, scaring the two men into following his orders. Martinez said that the man, whom he identified as Sneed, had stood around two feet from him and had approached from the gas station across the street. Lopez described the gunman as wearing a black sweatshirt and blue shorts, with hair that was "somewhat long" and tied up on top of his head.

After taking the men's property, the gunman walked away in the direction of the apartment complex behind the car wash. After he departed, Lopez and Martinez crossed the street to the gas station to call the police. Somphors Chao, whose family owned the gas station, stated that when a "clean-cut" Hispanic man came in and asked to use the phone, Chao told him that he would dial the number, and the man told him, "9-1-1." Chao asked him what had happened,

3

and the man told him that he had been robbed. Chao asked him where, they went outside, and the man pointed towards the car wash across the street.

Chao called 9-1-1, and police arrived around ten to fifteen minutes later. Fort Worth Police Officer George Rusnak arrived around 9:56 p.m. Upon arriving, he made contact with Martinez, who gave him a general description of the robber's clothing, hair, and size. After issuing a description over the radio, Officer Rusnak asked Chao for the store's surveillance videos, and Chao let him see them.

The trial court allowed State's Exhibit 15, a composite of the relevant portions of the surveillance videos, to be published to the jury. State's Exhibit 15 starts at 10:35 p.m. (actually, 9:35 p.m.)[2] and shows a young black male wearing a black hooded sweatshirt, long blue shorts, and his hair in a ponytail on top of his head, walking into the store. Inside, he encounters two young men, who he appears to know. At 10:38 p.m. (9:38 p.m.), he walks back outside with the two young men, and at approximately 10:40 p.m. (9:40 p.m.), he reaches the street; the car wash's lights are visible directly across the street.

Officer Rusnak and Chao watched the videos first; once they determined that there were some people wearing clothing matching the description reported by Martinez and Lopez, they brought Martinez and Lopez in to see if they could

---

[2]Chao explained that although the time stamp on State's Exhibit 15 shows that it was made around 10:30 p.m., because of daylight savings time, the actual time of the taping was around 9:30 p.m.

4

identify the robber. Martinez said that he recognized the robber from the video. Lopez stated that he identified the robber on the videotape based on his appearance, his clothing, and his hair.[3] Officer Rusnak said that while he and Chao watched the video, Chao told him that he knew two of the people in the video because they had been issued criminal trespass warnings. Officer Rusnak pulled up the criminal trespass report to obtain the addresses of the suspects in that case. He went to the address listed in the report and met with two juveniles listed in the report and their mother, but the two juveniles denied knowing anyone who fit the robber's description.

Fort Worth Police Detective Lorne Tracy testified that he received the case on March 16. He contacted Chao to obtain the surveillance video on March 18 and had his initial meetings with Martinez and Lopez on March 21. He sent the surveillance video to the digital computer lab to break the images into still photos, then gave the photos to the crime analysis unit so they could be included in a crime bulletin about the offense, which went out on March 28.

Fort Worth Police Officer Miguel Vargas, a neighborhood patrol officer, stated that on March 29, he saw a crime bulletin about the offense, which contained a photograph of the alleged perpetrator. The photograph was a store surveillance video photo of a black male wearing a black hoodie-type shirt and a

_____

[3]Chao described the person identified as the robber as someone who had been in the store earlier, wearing a black sweater or shirt with baby blue shorts and with his hair "in a high ponytail."

ponytail. Officer Vargas pulled up the offense report, saw the names listed on it, recognized one of them as an associate or friend of Sneed, and thought that the photo looked like Sneed. Sneed lived in Officer Vargas's patrol area, and he recalled that Sneed had been wearing a ponytail around a month before the offense. Officer Vargas called Detective Tracy and told him that he thought the suspect in the report was Sneed. Officer Vargas identified Sneed at trial.

After Officer Vargas contacted him about Sneed, Detective Tracy created photo lineups, one of which included Sneed's photo. He showed the photo lineup to Martinez on April 1, and Martinez identified Sneed as the robber. On April 15, Detective Tracy showed the lineup to Chao, who identified Sneed as the person who had been inside the store on March 15. Lopez tentatively identified Sneed from the photo lineup.

During the defense's case, Felicia Wilkerson, Sneed's mother, testified that on the evening of March 15, Sneed was at home watching DVDs with his family between 8:45 or 9:00 p.m. and 11:00 p.m. or 12:30 a.m. Wilkerson said that it was a mile to a mile and a half from their home to the gas station. She testified that during that time, Sneed had been trying to grow his hair out.

During cross-examination, Wilkerson said that Sneed's biological father lived in Burleson and that her husband was Sneed's stepfather. When the prosecutor asked Wilkerson whether she had ever seen Sneed or one of her

other sons hang out with A.E. or M.A.,[4] Wilkerson said that she did not know "those young men." Wilkerson said that she contacted Detective Tracy after she visited Sneed in jail and told the detective that there was no way that Sneed "could have done what he's been accused of because he was home."

After Sneed closed his case, the State recalled Detective Tracy, asked him about his interview with Sneed on April 15, and published the redacted audiotape of that interview.[5] Detective Tracy testified that he gave Sneed his *Miranda* warnings, that Sneed appeared to understand them, and that Sneed then voluntarily waived his right to remain silent. Detective Tracy testified that he showed photos from the video surveillance to Sneed, as well as photos of M.A. and A.E., and that he did not recall Wilkerson contacting him at any point during his investigation. He also stated, and the audiotape confirms, that Sneed told him that he had been at his father's house in Burleson. Detective Tracy said that his impression was that Sneed understood his questions and was just trying to figure out what the detective knew.

---

[4]We use initials to protect the juveniles' identities.

[5]Outside of the jury's presence, the State sought to admit the audiotape of Sneed's interview with Detective Tracy in response to Wilkerson's testimony about Sneed's alibi. Prior to its admission, the statement was redacted to remove references to Sneed's prior criminal record, extraneous offenses, and the detective's statements that were not part of the interview. Sneed objected to the admission of the redacted audio recording, but the trial court overruled his objections and granted him a running objection.

**B. Analysis**

Relying on *Johnson v. State*, 978 S.W.2d 703, 707 (Tex. App.—Corpus Christi 1998), *aff'd*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000), Sneed argues that the evidence is insufficient because Lopez could not positively identify him and failed to make an in-court identification of him and posits that Martinez's positive identification "may have been impermissibly tainted by watching the videotapes of the convenience store." He further complains that this evidence conflicts with his mother's testimony that Sneed was with her on the night of the robbery.

In *Johnson*, the court of criminal appeals reviewed the factual sufficiency standard set out in *Clewis v. State*, 922 S.W.2d 126, 131–32 (Tex. Crim. App. 1996), and upheld the Corpus Christi court's reversal of an aggravated sexual assault conviction based on the factual insufficiency of the evidence. 23 S.W.3d at 4, 7–12. In that case, the complainant had testified that after a man wearing a ski mask and gloves carjacked her, he blindfolded her and forced her into the passenger's seat before he drove her to a remote location and raped her. *Id.* at 4. The perpetrator removed his mask when he ordered her to perform oral sex, but although the car's headlights remained on, he never stood in front of the lights, and the complainant never had a lengthy, unobstructed view of his face and could only provide scant details of his overall appearance, including that he was uncircumcised. *Id.* The complainant was unable to positively identify the perpetrator after viewing several photo lineups, and the Corpus Christi court concluded that the additional evidence was insufficient to support his conviction.

8

*Id.* at 5–6. That evidence included DNA evidence that put the appellant within the 8.5% of the black male population that could have contributed the semen on the complainant's dress, the appellant's familiarity with the area where the assault occurred, the fact that he lived relatively close to the complainant's home, the fact that he was uncircumcised, and the fact that he escaped from jail while awaiting trial. *Id.*

In his dissent, Presiding Judge McCormick stated, "We should seize this opportunity to remove the judicially-inflicted *Clewis* opinion from the body of Texas jurisprudence." *Id.* at 12 (McCormick, P.J., dissenting) (footnote omitted). That is exactly what the court did ten years later in *Brooks v. State*, 323 S.W.3d 893, 895, 912 (Tex. Crim. App. 2010) (overruling *Clewis*, 922 S.W.2d at 131–32).

Notwithstanding the fact that we no longer apply a factual sufficiency review in criminal cases, *Johnson* is distinguishable on other bases as well. The complainant in that case specifically stated, "It was dark. I was blindfolded. I was so scared. He had a ski mask on most of the time. I didn't take a look at him very good," and she stated that she had not thought she would have a chance to identify him. *Johnson*, 23 S.W.3d at 5. In contrast, in addition to identifying Sneed from a photo lineup and at trial, Martinez testified about the clothing Sneed wore on the night of the robbery—blue shorts and a black hooded sweatshirt—and noted that the man's hair was held up in a ponytail on top of his head. Lopez also described the robber's attire and hairstyle in the same way, and Chao recognized the robber when Martinez pointed him out because the

9

robber had been in the store earlier, wearing a black sweater or shirt with baby blue shorts and his hair in a "high ponytail." Martinez testified that the area was well-lighted, even though it was nighttime, and that the robber only stood two feet away from them. And the timing matches up: Sneed was videotaped in the gas station at around 9:35 p.m., departing at 9:40 p.m., and the robbery occurred between that time and 9:56 p.m., when the police arrived to investigate. Although Sneed's mother testified that her son was home with her that night, Sneed stated in his interview with Detective Tracy that he was at his father's house in Burleson that night.

The jury was entitled to disbelieve Sneed's mother's testimony, particularly in light of the conflict between her testimony and Sneed's own statement, and to find credible the identifications made after the offense and at trial. Because the sufficiency standard gives full play to the jury's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts, and because we must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution, we conclude that the evidence, viewed in the light most favorable to the verdict, is sufficient to support Sneed's identification and conviction. *See Jackson*, 443 U.S. at 319, 326, 99 S. Ct. at 2789, 2793; *Blackman v. State*, 350 S.W.3d 588, 595 (Tex. Crim. App. 2011). Therefore, we overrule his first issue.

10

## IV. Preservation of Error

In his second issue, Sneed complains that the trial court abused its discretion by admitting State's Exhibit 18 and by allowing Detective Tracy to testify about the in-custody interrogation.

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a)(1); *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *Clay v. State*, 361 S.W.3d 762, 765 (Tex. App.—Fort Worth 2012, no pet.). The trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Pena v. State*, 353 S.W.3d 797, 807 (Tex. Crim. App. 2011). Further, a trial court's erroneous admission of evidence will not require reversal when other such evidence was received without objection, either before or after the complained-of ruling. *Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010) (citing *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998)), *cert. denied*, 131 S. Ct. 905 (2011); *Lane v State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004).

Although Sneed argues that he objected to the State's recall of Detective Tracy, the record does not reflect that he raised any objections other than to the admission of State's Exhibit 18, the interview recording. And although he complains that there "was an insinuation in the testimony and on the recording"

11

of what Sneed's father would say when he was not available to testify or be cross-examined, Sneed did not object during Detective Tracy's testimony.[6]  *See* Tex. R. App. P. 33.1; *Estrada*, 313 S.W.3d at 302 n.29.  Therefore, we overrule his second issue.

## V. Conclusion

Having overruled both of Sneed's issues, we affirm the trial court's judgments.

PER CURIAM

PANEL:  MCCOY, J.; LIVINGSTON, C.J.; and GABRIEL, J.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  August 22, 2013

---

[6]Even if Sneed had objected to Detective Tracy's testimony, what Sneed told him was not hearsay.  *See* Tex. R. Evid. 801(e)(2)(A) (stating that a statement is not hearsay if it is offered against a party and is the party's own statement).  Although Sneed argues that the purpose of State's Exhibit 18 was to use his statement that he was at his father's house "when he had specifically invoked his Fifth Amendment right not to incriminate himself," State's Exhibit 19, which was admitted without objection, contains the *Miranda* warnings that Sneed received and waived before the interview.

12