

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00116-CR
_____

TERRY HERNANDEZ, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 362nd District Court
Denton County, Texas
Trial Court No. F22-3160-362

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I.  Introduction

A jury found Appellant Terry Hernandez guilty of unlawful possession of a firearm by a felon, and he was sentenced to seven years' confinement.  *See* Tex. Penal Code Ann. §§ 12.34, 46.04(a), (e). In a single issue, Terry[1] argues that the State failed to prove possession.  We disagree, overrule his sole issue, and affirm the trial court's judgment.

## II.  Background

In May 2022, Terry and his three-year-old daughter Kelly[2] moved into his mother's three-bedroom house located in the Denton County portion of Carrollton. Terry and Kelly shared the home's middle bedroom, which contained a large bed for Terry and a small bed for Kelly.  Henry testified that Terry kept his belongings in the middle bedroom and slept in it, although Terry also occasionally slept on the living room couch.

---

[1]Because Terry's twin brother Henry Hernandez testified at trial, we refer to the twenty-nine-year-old brothers by their first names to avoid confusion and the other family members by their first names for readability.

[2]We use an alias for the minor child's name to protect her privacy.  *See* Tex. R. App. P. 9.10(a)(3); *see also* Tex. R. App. P. 9.8 cmt.

Around noon on July 26, 2022, Terry and his mother, Maribel, began arguing in front of Kelly, and Henry interceded. A fistfight between the brothers ensued, and Maribel called the police. She also took some photos of the fight.[3]

Carrollton Police Officers Christian Barefield, David Lee, and Travis Putnam responded to the reported major disturbance.[4] Officers Barefield and Lee were initially dispatched, and Officer Putnam responded when they requested backup. Officer Lee arrived first and spoke with Henry, who was outside when Officer Barefield arrived. Henry showed the officers his busted lip.[5] The officers could hear loud noises and voices coming from inside the house.[6] When the front door opened, Officer Barefield asked Terry to come outside. Terry said no and slammed the door in Officer Barefield's face.

Officer Barefield opened the front door and instructed Terry to return, but Terry walked away after telling the officer that he was going to get his phone. Officer Barefield drew his Taser and followed Terry into the middle bedroom, and Officer

---

[3]Terry testified that he was holding Kelly when Henry hit him and that after he put Kelly down, he hit Henry back twice before Henry put him in a chokehold.

[4]Officer Lee testified that a "major disturbance" is "any kind of fighting or physical altercation."

[5]After speaking with Terry, Henry, and Maribel, the police determined that Terry had been the aggressor. Terry testified that it was obvious to him that the police considered Henry the victim "because he was bleeding."

[6]Henry testified that the noises the police heard were caused by Terry's "trying to kick [their] mom's door down."

3

Lee followed him because he did not want Officer Barefield entering an unknown situation alone.

As Officer Barefield crossed the middle bedroom's threshold, he saw a small black gun on the larger of the two beds. Terry was between him and the firearm, so he drew his handgun, pointed it at Terry, and told him to step out of the room. Terry complied but told him, regarding the gun, "It's not for me. It's for my daughter's safety." During their subsequent conversation, Officer Barefield noticed Terry's ankle monitor, and Terry told him that he had a prior felony conviction.

At the conclusion of the officers' investigation, Terry was arrested for assault–family violence. While Officer Barefield drove Terry to jail, Officers Lee and Putnam retrieved the gun from what Officer Lee described as a very small room with a lot of things "within arm's reach." When Officer Putnam examined the gun, it was "loaded, ready to be fired," with three rounds in the magazine and a cartridge already chambered. Officer Putnam testified that the firearm was in working order on July 26, 2022, and there were other gun-related items in the bedroom. No one fingerprinted the gun.

Maribel did not tell the police that it was her gun, but at trial, she testified that the gun was hers and that she did not know how it had ended up in Terry's bedroom. When asked at trial if she knew what type of gun it was, she replied, "No. I only know it's a short gun." She denied having given the gun to Terry and said that the only reason he would have it was "[t]o clean it." She did not know how to load it.

4

Henry testified that he had not been aware that a gun was in the house until the police found it.

An English-language statement that Maribel had signed and given to defense counsel was offered and admitted into evidence.[7]  It states, "To whom this may concern, I . . . claim ownership and responsibility of the firearm found in my house. It was a 9mm Smith & Wesson. *I had let my son Terry Hernandez borrow it* for protection of my granddaughter [Kelly] from being sexually abused by her grandfather." [Emphasis added.]  Maribel stated that she told her daughter to write the statement for her.

No one denied to the police that the middle bedroom was Terry's, but during the defense's case, Terry testified that although he kept his belongings and Kelly's belongings in that bedroom, he did not sleep there "[b]ecause that room [was] hot." Instead, he claimed that he slept on the couch by the door and that the family used his room for storage.

Regarding whether he knew about the gun, Terry testified during his direct examination as follows:

> Q. Were you aware there was a gun in that bedroom?
>
> A. No, sir.  If I was aware I wouldn't have walked into that room.
>
> Q. Okay.  At any point did you try to use that gun?

---

[7]Maribel testified through an interpreter and stated that she was unable to read or write English.

A. No, sir.

Q. Was that your gun?

A. No, sir.

Q. Did you know it was in the bedroom?

A. No, sir.

Q. Whose gun was it?

A. My mom's gun.

Q. Okay. Did you ever have anything to do with that gun?

A. Yes. I cleaned it.

Q. Cleaned it one time?

A. Maybe twice.

Q. For your mother?

A. Yes.

During cross-examination, Terry testified that as a convicted felon, he knew he was not allowed to possess a gun:

Q. . . . Now, at this point in time you said you did not believe there was a gun in that room, correct?

A. Yes, ma'am.

Q. Because you know as a convicted felon you're not allowed to possess a gun. Is that correct?

A. Yes, ma'am.

Q. And you understand that having that gun in your room would be possessing it, correct?

A. No, ma'am.

Q. Having that gun in your room and knowing it's there is you possessing it, correct?

A. Knowing it's there, yes.

. . . .

Q. Okay. So it's your testimony today that you have no idea how that gun got on your bed?

A. Yes, ma'am.

Q. And it's your testimony today that you have no idea how the box for the gun got in your room?

A. Yes, ma'am.

Terry claimed that he did not see the gun on the bed until Officer Barefield told him to get back. He stated that after he saw the gun, he told Officer Barefield that the gun was to protect his daughter. Terry stated that his mother had the gun to protect Kelly and the house "because there w[ere] break-ins."

Body camera footage from Officers Barefield and Putnam was admitted into evidence and published to the jury, and it illustrated the events set out above. Maribel provided to the police her photos of the brothers' altercation. The photos show a violent struggle that resulted in massive holes in the walls on either side of the hallway. The police photographed the fight's damage to the home.

7

## III. Discussion

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021). The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021).

To establish that Terry unlawfully possessed a firearm as a felon, the State had to prove that he had previously been convicted of a felony offense and that he possessed the firearm after the conviction and before the fifth anniversary of his release from confinement or from supervision, whichever date is later. *See* Tex. Penal Code Ann. § 46.04(a). Terry challenges only the sufficiency of the evidence to support the elements of possession—that he exercised actual care, custody, control, or management of the firearm, *see id.* § 1.07(a)(39), and intentionally or knowingly obtained it, received it, or was "aware of his control of [it] for a sufficient time to permit him to terminate his control," *id.* § 6.01(b)—and the additional, independent facts and circumstances that affirmatively "link" him to the firearm's possession. *See*

8

*Blackman v. State*, 350 S.W.3d 588, 594–95 (Tex. Crim. App. 2011). The "affirmative" links" rule provides that when the accused is not in the exclusive possession of the place where the firearm is found, "it cannot be concluded that [he] had knowledge of and control over [the item] unless there are additional independent facts and circumstances which affirmatively link [him] to [it]." *Id.* (quoting *Poindexter v. State*, 153 S.W.3d 402, 406 (Tex. Crim. App. 2005)).

"Affirmative" links may include whether the firearm was in plain view, the appellant's proximity to and the accessibility of the firearm, whether he made incriminating statements, whether he attempted to flee, whether he owned or had the right to possess the place where the firearm was found, and whether his conduct indicated a consciousness of guilt. *See Tate v. State*, 500 S.W.3d 410, 414 (Tex. Crim. App. 2016) (listing nonexclusive factors that may indicate a link connecting the appellant to knowing possession of contraband); *Tucker v. State*, 183 S.W.3d 501, 510 (Tex. App.—Fort Worth 2005, no pet.) (same); *see also Robinson v. State*, Nos. 02-15-00039-CR, 02-15-00040-CR, 2016 WL 2766746, at *2 (Tex. App.—Fort Worth May 12, 2016, no pet.) (mem. op., not designated for publication) (noting that in unlawful-possession-of-a-firearm-by-a-felon cases, "we analyze the sufficiency of the evidence under the rules adopted for determining the sufficiency of the evidence in cases of unlawful possession of a controlled substance"); *Sutton v. State*, 328 S.W.3d 73, 77 (Tex. App.—Fort Worth 2010, no pet.) ("The purpose of linking the accused to the firearm is to protect innocent bystanders from conviction solely on their fortuitous

9

proximity to the firearm."). Each fact need not point directly and independently to guilt as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Blackman*, 350 S.W.3d at 595.

Terry argues that his case is like *Harris v. State*, 532 S.W.3d 524, 534 (Tex. App.—San Antonio 2017, no pet.), in which the court held that evidence of possession was insufficient because it showed only that a firearm was between the appellant's feet on the floorboard of a vehicle driven and owned by someone else. In *Harris*, during a traffic stop, an officer noticed the odor of marijuana and searched the vehicle. *Id.* at 526–27. During the search, the police found a duffle bag containing a loaded handgun (the Glock) on the passenger's side of the vehicle and another handgun under the driver's seat. *Id.* at 527. Nothing in the duffle bag linked the appellant to the Glock, which was not submitted for fingerprints. *Id.* at 530.

The driver told the police that he had bought the vehicle several weeks before; neither the driver nor the appellant was the vehicle's registered owner, and the appellant never claimed ownership of the duffle bag or either weapon. *Id.* at 530–31. The appellant did not attempt to flee, was calm, was very cooperative, and made no statements—conflicting or otherwise—about the Glock. *Id.* at 530, 532. The officer found no narcotics or other contraband on the appellant. *Id.* at 532. The court concluded that the evidence relied upon by the State—other than the Glock's location—was not the type of evidence relied upon by courts to affirmatively link a defendant to a firearm or was nothing more than speculation from which a jury could

10

not make a rational inference of possession: the Glock was not found on the appellant and was not in his exclusive possession, it was not in plain view, "nothing in the bag, on the bag, or in the vehicle" connected the Glock to him, and it was not found in a vehicle owned or driven by him. *Id.* at 531, 534.

We think this case is more like *Westbrook v. State*, No. 2-07-455-CR, 2008 WL 5672533, at *1 (Tex. App.—Fort Worth Feb. 26, 2009, pet. ref'd) (mem. op. on reh'g, not designated for publication). As here, in *Westbrook*, two competing story lines were developed at trial. *Id.* at *5. The arresting officers testified that after they collected a pistol and a shotgun from the appellant's mother, they asked the appellant whether there were any other weapons in the house, and the appellant told them that he had a shotgun in his bedroom and then pointed out to them a denim shirt that an officer unwrapped to reveal a twelve-gauge shotgun with four shells in it. *Id.* The appellant and his relatives, in contrast, developed a story that the appellant had no knowledge of the shotgun, which was owned by his mother, and his relatives testified that they believed a nephew who was staying with them had removed the shotgun from his grandmother's closet and had taken it into the appellant's room to clean it. *Id.* We concluded that the factfinder, as the judge of the witnesses' credibility, was entitled to believe the officers and not the appellant and his relatives. *Id.*

Here, Terry testified that he had not been aware that the gun was in his bedroom until Officer Barefield pointed it out, that he did not know how the gun got onto his bed, and that he had cleaned the gun "[m]aybe twice" for his mother. But

11

Terry's testimony reflects that he was aware that his phone was in that room because he advised Officer Barefield of that before he walked down the hall, making it unlikely that he had failed to notice the gun on the bed. As the judge of Terry's credibility and the weight to give his testimony, the jury was entitled to disbelieve Terry's assertions that he had not known about the gun on his bed in his bedroom and that he did not knowingly possess it. *See Martin*, 635 S.W.3d at 679.

Terry's mother likewise testified that the gun was hers and that she did not know how it ended up in Terry's room, but the jury could have chosen to disbelieve this testimony as well. *See id.* Further, the statement that she gave to defense counsel, which was offered and admitted into evidence, stated that she had let Terry borrow the gun to protect his daughter—an indication that she had given to Terry actual care, custody, control, or management of the firearm, *see* Tex. Penal Code Ann. § 1.07(a)(39), and that he had intentionally or knowingly obtained it or received it or was "aware of his control of [it] for a sufficient time to permit him to terminate his control," *id.* § 6.01(b). And Terry stated—as shown by Officer Barefield's body camera footage—regarding the gun, "It's not for me. It's for my daughter's safety," from which the jury could have determined his awareness of the gun's presence before Officer Barefield pointed out the weapon, which was in plain view, on Terry's

bed, in Terry's bedroom.[8]  *See Tate*, 500 S.W.3d at 414 (listing non-exclusive affirmative links such as the firearm's being in plain view, the appellant's proximity to and the accessibility of the firearm, the appellant's statements about the firearm, and whether he had the right to possess the place where the firearm was found).

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that the jury could have found the affirmative links necessary to determine Terry's possession of the firearm beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.  Accordingly, we overrule Terry's sole issue.

## IV.  Conclusion

Having overruled Terry's sole issue, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  January 11, 2024

---

[8]The record reflects that after deliberating for an hour, the jury asked to review body camera footage again and watched it twice.  The jury then deliberated for another twenty minutes.