

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00415-CR

CHARLES SOLOMON                                                   APPELLANT

V.

THE STATE OF TEXAS                                                     STATE

----------

FROM THE 211TH DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. F-2011-1542-C

----------

## MEMORANDUM OPINION[1]

----------

A jury convicted Appellant Charles Solomon of two counts of indecency with a child, for which the jury assessed two probated sentences, and one count of sexual assault, for which the jury assessed his punishment at five years' imprisonment in the penitentiary. In one point, Appellant contends the evidence was insufficient to support the three convictions. We affirm.

---
[1]*See* Tex. R. App. P. 47.4.

**Procedural Background**

*Count One – Indecency with a Child*

The State alleged in Count One that on or about July 16, 2005, in Denton County, Appellant, with the intent to arouse or gratify his sexual desire, engaged in sexual contact with Complainant by touching the breast of Complainant, a child younger than seventeen years of age and not the spouse of Appellant. The State alleged the offense of indecency with a child. Tex. Penal Code Ann. § 21.11(a)(1) (West 2011). It is a second degree felony. *Id.* § 21.11(d).

*Count Two – Aggravated Sexual Assault*

The State alleged in Count Two that on or about July 16, 2006, in Denton County, Appellant intentionally or knowingly caused the penetration of the sexual organ of Complainant, a child who was then younger than fourteen years of age and not the spouse of Appellant, by Appellant's finger. The State alleged the offense of aggravated sexual assault. *Id.* § 22.021(a)(1)(A)(i), (a)(2)(B) (West Supp. 2014).[2] The offense is a first degree felony. *Id.* § 22.021(e).

*Count Three – Indecency with a Child*

The State alleged in Count Three that on or about January 1, 2008, in Denton County, Appellant, with the intent to arouse or gratify his sexual desire, caused Complainant, a child younger than seventeen years of age and not the

---

[2]The amendments to this statute in 2007 and 2011 do not affect this case. Act of April 7, 2011, 82nd Leg., R.S., ch. 1, § 6.05, 2011 Tex. Sess. Law Serv. 1, 16 (West); Act of May 18, 2007, 80th Leg., R.S., ch. 593, § 1.18, 2007 Tex. Gen. Laws 1120, 1128. We therefore cite to the current statute for ease of reference.

spouse of Appellant, to engage in sexual contact by causing Complainant to touch Appellant's genitals. The State alleged the offense of indecency with a child. *Id.* § 21.11(a)(1). The offense is a second degree felony. *Id.* § 21.11(d).

*Count Four – Sexual Assault*

The State alleged in Count Four that on or about July 16, 2008, in Denton County, Appellant intentionally or knowingly caused the penetration of the sexual organ of Complainant, a child who was then younger than seventeen years of age and not the spouse of Appellant, by Appellant's finger. The State alleged the offense of sexual assault. *Id.* § 22.011(a)(2)(A).[3] The offense was a second degree felony. *Id.* § 22.011(f).

*Jury Verdict*

The jury found Appellant guilty of Counts One, Three, and Four, all of which alleged Complainant was younger than seventeen at the time of the offense. The jury found Appellant not guilty of Count Two. Count Two was the only count alleging Complainant was younger than fourteen at the time of the offense.

*Punishment*

On Counts One and Three, the jury assessed Appellant's punishment at confinement in the penitentiary for ten years and further recommended probation.

---

[3]The 2009 amendments to the statute do not affect this case. Act of May 18, 2009, 81st Leg., R.S., ch. 260, §§ 3, 4, 2009 Tex. Gen. Laws 710, 711. We therefore cite to the current statute for ease of reference.

On Count Four, the jury assessed his punishment at five years' confinement in the penitentiary. The trial court ordered the punishments on Counts One and Three to begin upon Appellant's release from the penitentiary on Count Four. The judgment reflects that the sentence for Count Four was to begin immediately and that the sentences for Counts One and Three were to begin upon Appellant's release from the penitentiary.

## The Evidence

### Complainant

Complainant was born in July 1993 and was twenty at the time of trial. She had never been married. She was raised by G.S. (Mother) and Appellant, and she had one sister, T.S. (Sister). She had never met her birth parents, was adopted by Foster Mother, and was subsequently placed by Foster Mother with Mother and Appellant when she was three years' old for Mother and Appellant to raise.[4] From about the summer of Complainant's fifth grade year until 2009, they lived across from the high school she attended. She graduated from high school in 2011 and then went to Texas A&M University.

---

[4]Complainant identified Foster Mother as D.M. Mother identified Foster Mother as D.H. Mother explained that Foster Mother was Complainant's foster mother, and in the process of babysitting Complainant for Foster Mother, Mother and Appellant became attached to Complainant. When Complainant became available for adoption, Mother and Appellant wanted to adopt Complainant, but their attorneys said Foster Mother had the better chance of adoption because Complainant lived with her. Foster Mother adopted Complainant but thereafter placed Complainant with Mother and Appellant.

Complainant testified the first time Appellant touched her was in their red Dodge Ram pickup truck on the way home from a rodeo in Oklahoma. Complainant said while she was dozing off, Appellant unbuttoned her shirt and touched her breasts with his right hand while driving with his left hand, but she pretended she was asleep. She said he started on top of her clothing and eventually worked his way under her shirt. She said he stopped when they got home. When she confronted Appellant about why her shirt was unbuttoned, Appellant responded that he did not know why and suggested she must have left it that way. Complainant said she was twelve at the time, did not want to believe it had happened, and did not tell Mother about it because she was in shock.[5] Complainant said she was too scared to say anything about it to anyone.

Complainant said the next time it happened was again on a return trip from a rodeo in Oklahoma. When they got home, she said she asked Appellant why he was touching her, and Appellant responded, "[Y]our mother and I do not do this and I need to do this or we will get a divorce. You can't tell anyone." His explanation made no sense to her. She described it as happening in the same

---

[5]Subsequent evidence showed the family purchased the red Dodge pickup on September 20, 2006, which would have meant Complainant was already thirteen, not twelve, when this incident occurred. The jury apparently pushed all of Complainant's estimates of her age at the time of the various events forward one year, making her one year older, which could explain why the jury found Appellant not guilty on Count Two, which was the only count requiring Complainant to be younger than fourteen at the time of the offense.

5

manner as the first time; the contact was both on top of and underneath her clothing.

Complainant further testified Appellant acknowledged many times that he knew he was not supposed to do that with her. "I confronted him and asked why on several occasions[,] and he'd say[,] [']I know I'm not supposed to, but I need to.[']" Numerous times when Complainant confronted him, Appellant responded he did it because he loved her so much. When Complainant responded that her friends' fathers loved their daughters too but did not touch them, she said Appellant got very angry and, on several occasions, threatened to have her "shipped back off to where [she] came from"; told her no one would believe her; stated he would divorce her Mother; and said she and Sister would end up in foster care. Complainant recalled this threat scared her because she did not know her birth parents.

Complainant testified that on her thirteenth birthday, Foster Mother sat her down and specifically asked her if Appellant was abusing her sexually. Complainant said she was too scared and too embarrassed to say anything so she denied any sexual abuse. When Appellant later found out about the conversation she had with Foster Mother, she said Appellant was not very happy about it, and things seemed to get worse after that. "He must have felt, [']Oh, she's not going to tell on me, so I'm in the clear.[']" Complainant said Appellant started doing more things more frequently. Complainant indicated Maternal

6

Grandmother also spoke to her about concerns of abuse within a week of Foster Mother's questioning her.

Complainant related that one of the things Appellant did was to make her wait until late into the evening before feeding the horses; she explained that they had to wait for the horses to finish eating before letting the horses back out, and while they waited, Appellant would have her lie on the couch and would "spoon" her. Complainant explained that spooning consisted of lying on the couch with Appellant behind her and with Appellant wrapping his arms around her; Appellant would get under her clothing and touch her breasts. Complainant said Appellant would cover them with a blanket. Many times Appellant would just be wearing his underwear. Complainant said it was "really weird," and she added that a lot of times Appellant just lounged around the house in his underwear. Complainant related when they spooned, she could tell Appellant was aroused. "His private area felt hard[,] and it would poke me." By his private area, she meant his penis. She said Appellant would have an erection. Complainant said the spooning on the couch went on from the time she was twelve until Mother, Sister, and she moved out of the house in October 2009. This happened every night for years because they had to feed the horses every night. Complainant explained that every night Appellant would wait until 9:00, 10:00, or sometimes 11:00 p.m. or later to put the horses into their stalls to feed them, and then they would give the horses an hour to eat before letting them back out of their stalls. Complainant thought the purpose of waiting so late to feed the horses was to ensure Mother

7

and Sister were already in bed. Absent some other activity, there was no reason not to feed the horses much earlier in the evening. Complainant explained that Sister was young and that Mother had to get up early for work, so by the time she and Appellant were feeding the horses, Mother and Sister were already in bed. Mother got up around 5:00 or 5:15 a.m. and would try to leave the house by 5:30 or 5:45 a.m. to beat the traffic to work. Appellant, in contrast, was an electrician, owned his own business, and was in charge of his own hours.

Complainant said Mother saw them on the couch many times. Mother got upset very frequently and would tell Appellant he could not lie with Complainant like that because it was not appropriate. Appellant would respond by getting angry at Mother. Appellant would say, "Just because you and your dad didn't lay like this does not mean it's not normal for us."

Complainant said Mother asked her several times if anyone was touching her, and she answered no. Complainant explained, "I was scared. I felt dirty. That was her husband. It makes me feel like a mistress. Like, I love my mom to death[,] and it makes me feel like he's cheating on her with me."

Sometimes Appellant would come early in the mornings to cuddle or snuggle. Complainant said Mother left the house earlier than Appellant. This meant Appellant, Sister, and Complainant were left in the house. Most mornings after Mother left, Appellant would come into Complainant's room, wake her up, and either walk her to his room or stay in her room where he would spoon her. "[A]fter the years of progression, he would tell me to take off all of my clothes and

8

lay up next to him[,] or he would insert his index finger into my private area." By private area, she meant vagina. The first time this happened, she asked Appellant to stop, but he responded, "Don't lie to me. I can tell you like it." Complainant said she was around thirteen; she believed she was under fourteen at the time. "Because I know when I talked to my foster mom [on] my 13th birthday, that's when things got worse." Complainant said it happened very frequently and progressed. She said it occurred in her bed, in Mother and Appellant's bed, and sometimes on the couch. Complainant explained that Mother would get Sister up, dressed, and ready for school before Mother left and that Sister would go back to sleep until it was time to leave for school. Complainant said these instances started to occur not too long after she turned thirteen and stopped a few months before they left the house in October 2009. Complainant said that, with few exceptions, it happened every week, Monday through Friday, whenever Mother had to leave for work.

Complainant had a cousin who was in the same grade as she was and whom she saw very often. This cousin would come over to her house almost every day after school and before school on some mornings. Because her cousin's mother left for work early, and because her family lived right across the street from school, her cousin would show up unexpectedly in the mornings, and from a bedroom window, Appellant and Complainant could see him coming in through the back gate. Complainant said Appellant would jump up in a panic and get dressed.

9

Complainant said Appellant would tuck her in every night after Mother and sister had already gone to bed. Appellant would always kiss her goodnight on the lips. Complainant said Appellant would goof around and stick his tongue in her ear.

Complainant remembered one particular morning when she was still asleep, she was awakened by Mother screaming because Mother saw Appellant lifting up Complainant's covers while trying to get into bed with Complainant as Complainant was still sleeping. Mother said, "What are you doing? You should not be in there." Appellant responded, "I just want to cuddle with her. I just want to snuggle. Just because you and your dad weren't this close doesn't mean it's bad for us to be." Complainant said she was thirteen or fourteen at the time.

When Complainant was fourteen or fifteen, there was an occasion when Mother and Sister left for an out-of-town softball tournament, and Appellant went through "the normal routine and . . . put his whole index finger inside of me and then . . . proceeded to perform oral sex on me." This occurred in Appellant's bed in his room in their home in Denton. Complainant remembered this incident because it was the first time Appellant performed oral sex on her and the first time he inserted his whole finger inside her vagina, and it hurt. Complainant said Appellant tried to make her perform oral sex on him, but she refused. Complainant said Appellant also touched her breasts with his hands. Complainant said she cried when this happened, as she frequently did when the incidents occurred. Complainant remembered running out to the pasture and

10

being scared, sad, and upset. She said, "It felt dirty. I didn't know what I did to deserve it. He used to be a really good dad until that point. We had done everything together. I don't know what made him change his mind." When Mother and Sister returned, Complainant said nothing to them. "From all the threats he had given me about what would happen if I told, I was scared and embarrassed and didn't want anybody to know."

Complainant recounted one incident when, while she and Appellant were on the couch, Appellant took her right hand and placed it under his underwear and on his penis to masturbate him. Appellant gave her instructions to move her hand up and down, so she did. Complainant thought she was fourteen or fifteen at the time. Mother and Sister were asleep.

When asked to describe her life from eighth grade until the abuse stopped, Complainant responded, "Awful. I had thought about suicide many times. I cried myself to sleep. I had so many rules and restrictions[;] I was confused. I felt awful and dirty[,] and I didn't understand how my dad went from being loving and a good father figure to one day deciding he didn't want that anymore."

Regarding boyfriends, Complainant said, "[Appellant] said I was way too young to have a boyfriend, that if I wanted a boyfriend, all I wanted to do was have sex and that he didn't approve of me having a boyfriend." Regarding dances, Complainant said, "If I danced with a boy more than once or twice, he would send other girls to cut in to dance with me or he would himself cut in to dance or he would make me leave because we had to feed the horses in the

11

middle of the dance." Complainant said he did not allow her to wear tank tops whereas Sister had no such restriction.

Complainant described another incident where Appellant performed oral sex on her while she was in Appellant's red Dodge in the pasture at their home in Denton. Complainant estimated she was thirteen or fourteen at the time. Complainant described how Appellant had her recline her seat back and how her legs were sticking out of the truck. Appellant unbuckled her belt, unbuttoned and unzipped her pants, and pulled one leg out of the pants while leaving the other leg in her pants.

Complainant said the abuse stopped a few months before they moved out of the house. Complainant recounted how Appellant woke her up like he did every morning after Mother left, walked her into his room, and followed the normal routine, except this time he stuck his penis through the hole in his underwear and started rubbing it against her vagina. Complainant said she pushed him away and started crying, but Appellant responded, "You like it. I know you do. Can I go grab a condom?" Complainant said she said no, but Appellant got one anyway. "I got out of bed and I got dressed and I ran out to the pasture to feed the horses and – and I tried to pretend like it wasn't happening and I just told myself to go about my day and try to get ready for school. I just wanted to block it all out." Complainant said that was the last time anything happened, and after that, Appellant was just verbally abusive. Complainant said it was 2009, and she was fifteen or sixteen at the time. Complainant thought

Appellant was kind of scared after that. "I finally took a little stance and stood up for myself." Complainant said Appellant responded by being hateful. She said Appellant said, "You know what, I don't need you anyway. I'll just give you 20 bucks and you can go have sex with everyone."

Complainant had facial acne and went to see a dermatologist to clear it up. The doctor prescribed her Accutane, but in order to be on Accutane, Complainant also had to have two methods of birth control, so she was prescribed the pill as well. Complainant said if a person got pregnant while on Accutane, the baby could have serious birth defects. Complainant maintained Appellant knew she was on birth control because he went with her to the office for every visit, and she got the prescription before the last incident with Appellant.

The first person Complainant told was her cousin from Abilene while she was in Abilene for his daughter's birthday. Complainant explained that she had not stayed overnight with Appellant since Mother had separated from Appellant, and when her cousin from Abilene told Complainant and Sister that they were going to have to stay overnight with Appellant, Complainant became terrified, and her cousin noticed and asked to go for a walk with her. When her cousin asked Complainant if she was okay, Complainant said she started crying uncontrollably. He asked her if Appellant had ever touched her, and she said yes and left it at that. At this point, the abuse had stopped, and Mother and Appellant were already separated and going through their divorce. That night Complainant slept with Sister and her cousin's wife, while Appellant and his girlfriend slept in the

13

trailer. Complainant still had not told Mother, and she asked her cousin to keep it a secret. This cousin testified, and his testimony was consistent with Complainant's.

Mother, Sister, and Complainant got a house not far from their previous house, and after the divorce, Sister and Complainant had visitation with Appellant. During Thanksgiving break, Complainant and Sister were arguing, and Complainant said something that caused Mother to ask her questions, and on this occasion Complainant told Mother that Appellant had been abusing her and that Complainant wanted to see a counselor. Complainant said she did not tell Mother anything more because it was embarrassing and because she felt like she had betrayed Mother. Complainant said she had never given Mother much detail about what had happened because she did not "want her to have to have that image in her head."

Complainant said a truck was purchased at her sixteenth birthday, but no one told her the truck was hers. Complainant said she drove it twice. She won a horse trailer in 2005 in a contest. She also had horses that were purchased for her. Complainant said she did well in school. Her grade point average was above a 4.0. She was in National Honor Society, which required a grade point average of 4.25 or higher.

Complainant got counseling from the psychotherapist who was also their family counselor while the divorce was pending. After speaking to her psychotherapist, Mother and Complainant went to the police. Complainant said

14

she went to the Children's Advocacy Center in Lewisville where they interviewed her on tape. Complainant also saw a sexual assault nurse examiner and underwent a physical examination.

*Mother*

Mother said they had many conversations about how Appellant and Complainant would lie on the couch in a manner she called "spooning," which she described as Complainant lying in front of Appellant and Appellant having his arms around Complainant. Mother said there was one morning when she saw Appellant in the same bed with Complainant. Complainant was asleep, and Appellant was standing there in his underwear with an erection. Mother said she and Appellant fought about it quite a bit but could not speak too freely when both children were present. Mother thought Complainant was twelve or thirteen at the time. Mother described the same Thanksgiving incident that Complainant recounted and confirmed Complainant did not give her any details. When asked about why she did not report Appellant after others had expressed concerns, Mother responded, "I guess I went to him. He was my husband." When asked if she would have reported Appellant if she felt something inappropriate had been going on, Mother responded, "I think if I – if I truly believed it, yes." She added, "I didn't want to believe that."

*The Family Friend from the Saddle Club*

A family friend from the saddle club said she had seen Complainant sitting on Appellant's lap. She described one instance when she came around her

15

trailer and saw Appellant and Complainant in an embrace. The family friend said she thought the embrace was inappropriate.

*Mother's Sister-in-Law*

Mother's sister-in-law said she had seen Appellant and Complainant holding hands. On another occasion she had seen Appellant give Complainant a kiss on the lips. Despite her concerns, she admitted never telling Mother.

*The Psychotherapist*

A licensed family therapist and psychotherapist met with Appellant and Mother in November 2009 to develop a parenting plan. After talking with Complainant and Sister, the psychotherapist had fairly significant concerns about any visitations with Appellant. Complainant and Sister demonstrated for the psychotherapist how Appellant would lie on the couch with Complainant.

The psychotherapist said there was a snuggling issue with Appellant. She had seen a demonstration of how Appellant snuggled with Complainant, and she described it as "a father laying behind his daughter, the daughter in front, and caressing." The psychotherapist addressed the snuggling issue with Appellant once, and Appellant indicated he did not think it was inappropriate and insisted he was just being affectionate with his daughter. Appellant admitted getting into Complainant's bed either in the morning or in the evening.

The psychotherapist said she had an ethical duty to report sexual abuse. She did not report Appellant initially because she was trying to determine what was going on. The psychotherapist knew there was inappropriate touching but

added the family failed to validate. The psychotherapist said the girls were already in a safe environment, so the safety concerns had already been addressed. If she believed abuse had occurred, she said she would have had to report it. Regarding whether the psychotherapist ever went to the police, the psychotherapist said she instructed Mother to go to the police, and Mother did. The psychotherapist thought she called the police as well.

*The Forensic Interviewer*

A forensic interviewer from the Children's Advocacy Center testified. She interviewed Complainant and Sister on November 29, 2010. During the interview, Complainant said she had been attending counseling as part of the divorce proceeding and had hinted at the abuse but did not tell the counselor. The forensic interviewer was trained to watch for coaching, and after talking to Complainant, she did not have any concern that Complainant was being coached. She defined coaching as someone telling a child what to say or guiding a child about what to put in a statement.

The forensic interviewer said a delayed outcry occurs when the child fails to disclose the abuse when it occurs but waits, instead, until a time when the child feels safe and comfortable before disclosing the abuse. Delayed outcries are fairly common. The forensic interviewer explained that there are many different reasons children delayed disclosure. If the perpetrator was in the home, the child might not feel safe; if the child did not have a protective parent or if the perpetrator made threats, the child might delay disclosure; and if the perpetrator

17

was a parent, the child would experience a conflict of loyalties. The forensic interviewer added that when a parent in the home abuses a child, the child experiences a lot of conflict regarding when and how to disclose the abuse and about whether others will trust the child; additionally, the parents tend to manipulate the child a great deal, and the child does not know how to handle it. The forensic interviewer said that anytime a perpetrator threatens a child, the child could find it very difficult to make an outcry, and Complainant's situation involved a father who made threats and a delayed outcry.

The forensic interviewer said that in sexual abuse cases, sometimes there is physical evidence and other times there is not. The absence of physical evidence, therefore, did not correspond to nothing having happened.

*The Sexual Assault Nurse*

A Denton County SANE coordinator testified.[6] She met with Complainant for a sexual assault exam on January 24, 2011.

The SANE coordinator said penetration would not necessarily cause injury to the hymen. In a study of 2,384 children with known penetration, only four percent showed any injury, and the other ninety-six percent had no abnormal findings whatsoever. She examined Complainant and did not note any injuries. Not seeing any injury could still be consistent with sexual abuse. It was also consistent with nothing having happened. She said typically with children around

---

[6]SANE stands for "sexual assault nurse examiner."

Complainant's age, if the injury were minor, it would typically heal within three to four days. Touching would potentially cause less injury than penetration.

The SANE coordinator said the only thing she had to go on as evidence of a sexual assault was Complainant's testimony. She admitted there was no physical evidence.

*Sister*

Sister said almost every day, after Mother left, Appellant would get out of bed and then go to Complainant's room. Sister acknowledged not knowing what went on in Complainant's room; at the time, Sister said she did not think anything of it. Sister saw Appellant in bed with Complainant one time. Mother was not aware of what was going on.

Sister said there were times when she would see Appellant and Complainant on the couch together, with Appellant lying on the backside of the couch, with Complainant lying in front of Appellant, and with Appellant having his arm around Complainant. Sister said there was more than one argument between Mother and Appellant about Appellant and Complainant being on the couch together. Sister said she and Complainant demonstrated for the psychotherapist how Appellant would lie on the couch with Complainant.

*The Cousin from High School*

Complainant's cousin, who attended high school with Complainant, said his mother worked early some mornings; rather than leave him at school, where he would be locked out until the school opened, his mother would drop him off at

19

Complainant's house. Sometimes he would knock before coming in, and sometimes he would come in unannounced. Complainant's cousin said he would usually walk in and sit on the couch, but if he heard something suggesting someone was up, he would walk back to see who it was. He said "about a handful" of times he walked past the bedrooms and saw Appellant in Complainant's bed. Complainant's cousin said Appellant would not react in shock or try to pull up the blankets. Complainant's cousin said he never discussed it with Complainant.

### Appellant's Sufficiency Challenge

In his only point, Appellant contends the evidence is insufficient to support his convictions on Counts One, Three, and Four. Appellant emphasizes that Complainant made no outcry until Mother was involved in a divorce. He points out that Complainant had many opportunities to make an outcry but never did. While the abuse was allegedly occurring, he notes that Complainant never reported anything to the police. Both Mother and Sister lived in the house in which most of the alleged sexual activity occurred, but neither saw any improper conduct. Appellant notes the spooning was not hidden. When Complainant's cousin visited in the mornings, he would see Appellant in Complainant's bedroom but otherwise saw nothing out of the ordinary. Appellant stresses that there was no physical evidence against him. He points out that the sexual exam showed no hymen penetration or vaginal injury. At trial, Appellant argued Complainant was exacting revenge against Appellant for the divorce, which was breaking up

20

the family; for Appellant's numerous chores and restrictions; for never formally adopting her; and for selling her horse, her horse trailer, and the pickup she had been given on her sixteenth birthday.

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Blackman v. State*, 350 S.W.3d 588, 595 (Tex. Crim. App. 2011). The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Winfrey*, 393 S.W.3d at 768. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011); *see Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We must presume that the factfinder resolved any conflicting inferences

21

in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Temple*, 390 S.W.3d at 360.

Appellant is correct in asserting there was no physical evidence against him. However, the forensic interviewer said the absence of physical evidence did not rule out abuse. The SANE coordinator said that even in known cases of penetration, the chances of finding any injury was one in twenty-five. There could be sexual abuse and no injury; consequently, the absence of any physical injury was not dispositive.

Appellant's remaining arguments all effectively attack Complainant's credibility. Complainant's testimony established the elements of the three offenses for which Appellant was convicted. Complainant would not have turned seventeen until July 2010. Complainant said the abuse stopped in 2009. She was not Appellant's spouse. She said Appellant touched her breast under circumstances that could only be explained as having been done with the intent to arouse or gratify his sexual desire. She described another instance when Appellant took her hand, placed her hand on his penis, and had her masturbate it. Finally, she described Appellant inserting his finger into her sexual organ. Ultimately, the only question was whether the jury believed Complainant beyond a reasonable doubt. The jury did.

Other evidence explained why Complainant's outcry would be delayed. The forensic interviewer explained the dynamics of delayed outcries, and those dynamics were in play here. Appellant was Complainant's father figure, and he

threatened to have her "shipped back off to where [she] came from."[7] Complainant's first outcry occurred after she was no longer living with Appellant.

Although no one else saw the offenses, other witnesses observed inappropriate behavior consistent with Complainant's testimony. Others saw Appellant spooning with her on the couch, lying in bed with her, embracing her, and kissing her, and Appellant argued with the psychotherapist about the appropriateness of his snuggling with Complainant. And although no one reported Appellant, the psychotherapist perhaps described the situation best when she said the conduct described to her was inappropriate but hesitated to call it illegal.

Complainant never described the actual offenses as occurring while others were present or in a manner in which they could have been observed by others. The absence of corroborating witnesses to Complainant's accounts of what was happening under a blanket or when no one was around was not out of character with the observable inappropriate but not necessarily illegal behavior. The jury could have reasonably concluded that Appellant's openly affectionate course of conduct was but the observable surface of the continuing hidden sexually assaultive offenses described by Complainant that she alone endured over the years and that no one else saw. To the extent Appellant complains there was

[7]Regarding threats, we note the trial judge had to threaten members of the audience with confinement in jail for their behavior while Complainant was testifying. Twice.

23

nothing to corroborate the criminal conduct, corroboration would have made Complainant's case stronger, but the absence of corroboration did not preclude the convictions. If believed beyond a reasonable doubt, Complainant's testimony, standing alone, was sufficient. The jury's verdicts reflect she carried her burden on three of the four alleged offenses. The jurors were the sole judge of the weight and credibility of the evidence. *See Winfrey*, 393 S.W.3d at 768. We do not re-evaluate the weight and credibility of the evidence. *See Isassi*, 330 S.W.3d at 638. Based on Complainant's testimony, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Winfrey*, 393 S.W.3d at 768. To the extent Appellant gambled no one would believe Complainant, he lost that gamble. We hold the evidence was sufficient and overrule Appellant's sole point.

### *Conclusion*

Having overruled Appellant's sole point, we affirm the trial court's judgment.

/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL: GARDNER, MCCOY, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: December 31, 2014

24