

| | | |
|---|---|---|
| CLIFTON JAMES GRIMES, | § | No. 08-20-00111-CR |
| Appellant, | § | Appeal from the |
| v. | § | 50th District Court |
| THE STATE OF TEXAS, | § | of Baylor County, Texas |
| Appellee. | § | (TC# 5707) |

## O P I N I O N

Appellant, Clifton James Grimes, appeals his conviction of possession of a controlled substance penalty group 1 (methamphetamine) in the amount of 4 grams or more but less than 200 grams. TEX.HEALTH & SAFETY CODE ANN. §§ 481.102(6), 481.115(a), (d). In two issues, Appellant asserts the trial court erred by denying his request to represent himself and the evidence at trial was insufficient to support his conviction. We affirm.

## BACKGROUND

On January 15, 2019, just before 3:00 a.m., Sgt. Bryce Sawyer drove by a house, owned by Jimmy Barker, that the Seymour Police Department believed to be associated with the selling of narcotics and saw a truck parked out front. As the truck left the house, Sgt. Sawyer noticed that it had a faulty taillight and that its registration was expired, so he conducted a traffic stop. When the truck stopped, Appellant, the driver of the truck, immediately jumped out of the truck and waved his hands up in the air. Due to safety concerns, Sgt. Sawyer stepped out of his patrol car

and told Appellant to get back into his truck. Sgt. Sawyer approached Appellant and asked him why he had been at Barker's house. Appellant replied that Barker owed him some money and showed the officer nine dollars that he had collected from him. Sgt. Sawyer obtained Appellant's driver's license and went back to his car to run a license check.

When Sgt. Sawyer returned to speak with Appellant, he explained the reasons for the traffic stop and stated that they had reports that Barker sold narcotics out of his house. Appellant claimed that he did not have any drugs on him and that he did not do drugs because he was subjected to drug testing at his job. Sgt. Sawyer asked Appellant if he could pat him down, to which Appellant replied that he had a pocket full of knives. As Sgt. Sawyer opened the door for Appellant to get out of the truck, he told Appellant that he would take care of the knives. Appellant stepped out of his truck and began to take his knives out of his pockets. Sgt. Sawyer took Appellant's knives and left to place them on the hood of his patrol car. He then returned to Appellant and told him that he would pat him down "real quick." Appellant reached into his right jacket pocket and after he showed Sgt. Sawyer a medical card, he zipped up his right jacket pocket. Sgt. Sawyer then touched the bottom corner of Appellant's right jacket pocket and as he felt a bundle of rocks or pebbles, which he suspected was methamphetamine. He asked Appellant what was in his pocket. Appellant reached into the pocket and after feeling around for a few seconds, took out some paper. Sgt. Sawyer touched the corner of the pocket again and said, "[t]here's something right here. What is this?" Appellant replied, "I'll tell you what it is. It's speed is what it is." Sgt. Sawyer placed Appellant under arrest and took possession of a plastic baggie that contained white crystals. After he placed the plastic baggie on the hood of the patrol car, he asked Appellant if he had any other narcotics and Appellant told him that he had a broken pipe and a syringe in his left pocket. Sgt. Sawyer retrieved the broken pipe and syringe and placed them on the hood of his patrol car.

2

Throughout the remainder of the encounter, Appellant threatened to expose alleged bad acts committed by members of the Seymour police department to the federal authorities. He also denied that he had purchased any narcotics and claimed that someone else had been wearing his jacket.

Sgt. Sawyer completed his investigation at the scene and then transported Appellant to the Seymour Police Department to be formally booked. After Appellant was placed into a cell, the jailer, John Byrket, inventoried Appellant's property and found a plastic baggie that contained a white powdery substance in a pack of cigarettes. This second plastic baggie was turned over to Sgt. Sawyer who sent it, along with the plastic baggie found in Appellant's pocket, to the Texas Department of Public Safety Crime Lab in Abilene, Texas.

Appellant was indicted for possession of a controlled substance penalty group 1 (methamphetamine) in the amount of 4 grams or more but less than 200 grams. TEX.HEALTH & SAFETY CODE ANN. §§ 481.102(6), 481.115(a), (d). At trial, the State offered the video footage from Sgt. Sawyer's dashboard and body cameras into evidence and played the portions depicting the events Sgt. Sawyer testified about for the jury. The certificate of analysis and chain of custody affidavit, along with the attached laboratory report, were offered into evidence without objection. The lab report showed that the DPS Crime Lab analyzed the substance contained in the plastic baggie and determined that it contained 9.38 grams of methamphetamine.

Appellant testified and claimed that prior to being stopped, he had gone on a car ride to Vernon with Barker and his wife. During the car ride, Barker's wife said that she was cold, so he loaned her the jacket where the contraband was found. Barker's wife returned his jacket to him when they got back to Barker's house, and he was not aware that he possessed any contraband until the officer pulled it out of his pocket. Appellant also stated that he was not aware that there was contraband in his pack of cigarettes and added that Barker and his wife had access to it.

3

Appellant asserted that Barker and his wife warned him not to leave their house because he would be stopped by the police and that in hindsight, they probably warned him because they were selling drugs.

At the conclusion of the trial, the jury returned a unanimous guilty verdict. For punishment-enhancement purposes, the State alleged that Appellant had been twice previously convicted of felony offenses. The jury found the State's enhancement allegations to be true and imposed a 40-year sentence in the Texas Department of Criminal Justice Institutional Division. This appeal followed.

## DISCUSSION

### *Issues*

On appeal, Appellant argues that the trial court erred by denying his request to represent himself and that there was insufficient evidence that the substance he possessed was contraband.

### *Did the trial court err in denying Appellant's request for self-representation?*

In his first issue on appeal, Appellant argues that the trial court erred when it denied his motion to represent himself. He claims that his Sixth Amendment right was violated because counsel was forced upon him.

### *Applicable Law & Standard of Review*

The Sixth Amendment to the United States Constitution and Article 1, section 10 of the Texas Constitution both establish a defendant's right to counsel in a criminal trial. *Geeslin v. State*, 600 S.W.2d 309, 313 (Tex.Crim.App. 1980). Part and parcel with this protection is the constitutional right to have counsel appointed by the court if a defendant cannot afford private counsel. *Gideon v. Wainwright*, 372 U.S. 335, 342-43 (1963). The United States Supreme Court has also recognized that the right to counsel encompasses the right to represent oneself at trial by

negative implication. *Faretta v. California*, 422 U.S. 806, 834 (1975). The right to self-representation is absolute, save for a threshold competency inquiry to determine whether special circumstances demonstrate the existence of a "mental-illness-related limitation on the scope of the self-representation right." *Indiana v. Edwards*, 554 U.S. 164, 171 (2008).

The Constitution permits States to insist upon representation by counsel for those competent enough to stand trial, but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves. *Edwards*, 554 U.S. at 174; *Chadwick v. State*, 309 S.W.3d 558, 560-61 (Tex.Crim.App. 2010). Mental illness alone is not sufficient to allow the trial court to prevent a defendant from asserting his *Faretta* rights. *Moore v. State*, 999 S.W.2d 385, 395 (Tex.Crim.App. 1999). "To raise the issue of competency by means of the defendant's past mental health history, there generally must be evidence of recent severe mental illness or bizarre acts by the defendant or of moderate retardation." *Id.* In assessing a defendant's competency to self-represent, the trial court should bear in mind that "[d]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant." *Edwards*, 554 U.S. at 176 (citing Brief for American Psychological Association *et. al.* as *Amici Curiae* supporting neither party at 26).

The trial judge is in the best position to decide whether a mentally ill defendant is competent to proceed *pro se*. *Chadwick*, 309 S.W.3d at 560. Because the issue on appeal is a mixed question of law and fact which turns on an evaluation of credibility and demeanor, we review the trial court's ruling for an abuse of discretion. *Chadwick*, 309 S.W.3d at 561.

***Discussion***

5

In the months leading up to trial, three pretrial hearings were held. At the first pretrial hearing, Appellant requested a change of venue because he had evidence numerous people in Baylor County had been stealing money and property from him and had repeatedly had him arrested on false charges, including the present one. He also claimed to have videos of bad acts committed by police officers and alleged they were involved in this conspiracy to have him sent to the penitentiary so that they could steal his property. Appellant explained his property earned eighteen hundred dollars per second and stated, "[t]he property, and the satellites are on my property, and I get a percentage of it. But cell phones, television satellites, two-way communications, like police station communication satellites, all of that is on my property, and I get -- plus windmill towers." He further claimed the "whole world" was connected to the satellites on his property and he received a percentage of everything "they" sold using that satellite dish. The trial court denied Appellant's motion for change of venue and, at defense counsel's request, ordered a competency evaluation of Appellant.

At the second pretrial hearing, defense counsel informed the trial court Appellant wished to have a new attorney appointed to him and asked to put Appellant on the stand so he could make his request. On direct examination, Appellant stated that he wanted the trial court to appoint him another attorney because his attorney was not doing what he asked her to do. Specifically, he claimed she refused to investigate whether a certain dispatcher, who had been fired for allegedly tampering with evidence in another case, had tampered with the evidence in his case. Appellant acknowledged defense counsel had reviewed the evidence in his case with him, but again complained she had ignored matters he had pointed out and added she had tried to force him to plead guilty by threatening him with enhancement allegations. The trial court interrupted Appellant and explained the district attorney, not his attorney, would decide whether to pursue enhancement

6

allegations and his attorney was simply informing him of what could occur if he proceeded to trial. However, despite being informed of this, he reiterated his request to fire her.

On cross-examination, the prosecutor asked Appellant whether he was aware that the dispatcher he complained of could not have accessed the evidence in his case because she had been employed by a different agency and worked in a different building from where his evidence was stored. Appellant ignored the question and continued to maintain that the dispatcher had tampered with the evidence in his case. Appellant also said that he had videos that would show that he was being railroaded because of a conflict of interest with the police department and certain people were attempting to send him back to the penitentiary so they could profit off of the property that he had inherited from his grandmother.

The trial court denied Appellant's request to appoint a different attorney stating the credibility of witnesses was something that could be challenged at trial. Further, based on Appellant's testimony, his current attorney was representing him fully and was not trying to force him to plead guilty.

At the third pretrial hearing, defense counsel requested the trial court address Appellant's competency. Before the hearing proceeded, Appellant relayed he wished to fire his attorney and argued based on what he had read in "the law book," he had a right to fire the first three attorneys appointed to represent him. The Appellant expressed his frustration proceeding with the hearing given he had been found competent. The trial court agreed, based on his evaluation, Appellant was competent to stand trial, but explained to him that his attorney wanted to present some other matters and asked Appellant to follow the rules of the courtroom. Appellant replied, "I don't give a shit" and despite the trial court's admonishment his attorney needed to present some matters to protect the record, he reiterated his belief he was not being properly represented. The trial court

again stated his competency would be addressed first and then the issue of his representation would follow.

During direct examination, Appellant expressed his anger at defense counsel for not filing several motions he had asked her to file regarding the conspiracy against him by the dispatchers and the police department and disagreed with her assessment the motions were frivolous. Defense counsel attempted to explain a jury trial would soon commence where a jury would determine his guilt or innocence. Appellant replied he did not want a jury trial in Baylor County due to what had been stolen from him and because of the conspiracy to put him in the penitentiary. The trial court then intervened and asked Appellant if he wanted a jury trial, to which Appellant stated he wanted the trial court to view the evidence. The trial court explained it could not review the evidence before the trial and disagreed with Appellant's assertion in his prior cases, the trial judge had reviewed the evidence. Appellant stated he would proceed to a jury trial and made clear he was not incompetent given he had successfully represented himself in the past in a situation where his attorney had done the "same thing" as his present attorney.

The following exchange then took place:

Defense counsel: Do you wish to represent yourself?

Appellant: Well, I'm pretty much doing that right now.

Defense counsel: You need to express to the Judge whether or not you wish to represent yourself.

Appellant: May I say something? How many times do I have to say I want to fire her before I can fire her?

Trial court: Well, you can say it --

Appellant: I mean, she keeps asking me if I want to represent myself. I've been doing that from the start. She's constantly fighting against me. She's wanting to see if I'm incompetent or not. Well, I've already done that (Indicating) when we went and seen the psychiatrist, two of them, the last time. Why do we need to do it again?

8

Defense counsel: Do you understand that it's in order to preserve any rights that you may have?

Appellant: I think it's --

Trial court: What were you going to say?

Appellant: No. You don't want to hear what I was going to say.

Trial court: Okay. I think I figured it out.

Defense counsel: So Mr. Grimes, you do not want to represent yourself?

Appellant: Yes, I want to represent myself. I've been doing it. Why do I not want to represent -- actually, a court-appointed lawyer is to help assist me represent myself.

Based on Appellant's responses, defense counsel indicated they would be moving on to a *Faretta* hearing. In response to questioning, Appellant relayed he had a high school education and although he had never handled a jury trial, he knew exactly how a jury trial proceeded.

During cross-examination, Appellant's competency evaluation, which concluded he was competent despite his exhibition of paranoia and delusional thinking, was admitted into evidence. Appellant testified he knew some of the rules involved in picking a jury and explained, "[i]t will be me and the lawyer and you and the Judge, and they'll come through, and we'll ask questions, and you'll check one, and you'll check one, and the whole process." The prosecutor explained the trial court was trying to protect his rights and having a "lawyer usually helps people." Appellant replied, "[w]ell, having a lawyer always helps people, but in the law book that I read, it says that the State has to appoint a lawyer to help represent you in your case. It doesn't say they appoint a lawyer to take care of your case and you sit there and let them do what they want."

On redirect examination, Appellant confirmed he did not agree with defense counsel's opinion his prior convictions could be used to enhance his sentence. When Appellant was asked

9

about his belief he could fire up to three appointed attorneys, he became agitated and said he would no longer answer any more questions. He then said, "I want a lawyer who's going to represent me. Get them in here and get this case took [sic] care of, and I can get out of here. I'm tired of this playing around crap! I'm tired of you arguing with me every time we come in this courtroom!" He then expressed his frustration with his attorney not doing what he had asked her to do by stating, "[y]ou won't do what I'm asking you to because you think I'm stupid. Well, I don't care if you think I'm stupid. You're fired! I don't need you!

The trial court ultimately found Appellant incompetent to represent himself and provided the following explanation for the decision:

> Okay. I have heard from Mr. Grimes at a previous hearing, which he doesn't call a pretrial, but I thought was a pretrial, and this pretrial. And while I know that he has some knowledge of the law and certainly is experienced in the system, I don't think he is stupid. I think he is competent based on the evaluation, all of those things. But from listening to his criticisms of Ms. Marsh as his attorney, I do not believe that he is able to represent himself in this matter.
> And I believe, from what I'm hearing, that I can see that Ms. Marsh has worked hard for him, and she has not tried to push a plea bargain down his throat because we are set for a jury trial on January the 21st, and she has been preparing to get ready for that jury trial.
> So I am not going to allow Mr. Grimes to represent himself. He does not seem to understand the Rules of Criminal Procedure. He has some confused or mistaken understandings of what the law is on various topics that he has revealed to the Court today, and I do not believe that he would be able to conduct a trial in a way that would be beneficial to himself, so I'm going to deny his motion to represent himself.
> Note his exception to that ruling. Okay. Ms. Marsh, I will keep you appointed to represent Mr. Grimes in this matter.

Appellant expressed his displeasure with the ruling and threatened to reveal evidence to a federal judge stating,

> I'm filing charges on Baylor County, and I'm sending my evidence of my stolen property, of which they are drawing money off of, too. And I'm also sending the bank, the check - - the checks that are written to the people who are accepting money in order to incarcerate me to keep me from filing charges on them for stealing my stuff, and are setting me up to keep me from filing charges on them.

And it all pertains to this case, because they set me up. Sheriff Zeissel followed Jeremy Parker across the county line with his parking lights on. I watched him follow him all the way over there --

The trial court informed Appellant he could do those things but warned him it would not allow the court proceedings in front of the jury to be "chaotic" and he would be removed from the courtroom if he disrupted the proceedings.

As detailed above, the trial court had ample opportunity to observe Appellant's demeanor and evaluate his statements and responses. The record shows Appellant requested his defense counsel file several frivolous motions and he refused to listen to explanations as to why they were frivolous. Appellant engaged in disruptive behavior prompting the trial court to warn him he would be removed from the proceedings if he continued to engage in such chaotic behavior. Appellant also repeatedly fired his attorney because he believed she was trying to force him to plead guilty by threatening him with enhancement allegations. And, notably, Appellant detailed his claim he had video evidence of the police department's wrongdoing he intended to turn over to the federal authorities and his belief certain individuals were involved in a conspiracy to send him to the penitentiary so they could profit from his highly lucrative satellites. Thus, the trial court observed Appellant's bizarre behavior and viewing the evidence observed by the trial court in the light most favorable to the trial court's ruling, we conclude the trial court did not abuse its discretion when it denied Appellant's request for self-representation. *Edwards*, 554 U.S. at 177 ("[P]roceedings must not only be fair, they must appear fair to all who observe them.")[Internal citation and quotation marks omitted]; *Chadwick*, 309 S.W.3d at 562 (affirming denial of self-representation where defendant filed incoherent motions, disrupted trial proceedings, and threatened to place an "Israeli curse" on the trial court).

We are instructed to give almost total deference to the trial court's rulings on mixed

questions of law and fact when the resolution of the issue turns on an evaluation of credibility and demeanor. *Id*. at 561. Further, the trial judge was in the best position to determine whether Appellant was competent to represent himself at trial, therefore, we conclude there was no abuse of discretion in refusing Appellant's request to represent himself. Issue One is overruled.

## LEGAL SUFFICIENCY

In Issue Two, Appellant asserts the evidence is legally insufficient to support his conviction beyond a reasonable doubt.

### *Standard of Review & Applicable Law*

Under the Due Process Clause of the U.S. Constitution, the State is required to prove every element of the crime charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). In *Brooks*, the Texas Court of Criminal Appeals held the only standard a reviewing court should apply when examining the sufficiency of the evidence is the legal sufficiency standard articulated in *Jackson*, which requires affording deference to the jury's credibility and weight determinations. *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex.Crim.App. 2010). The critical inquiry in a legal sufficiency challenge is whether the evidence in the record could reasonably support a conviction of guilt beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007).

When reviewing the legal sufficiency of the evidence, we must view all of the evidence in the light most favorable to the verdict to determine whether any rational juror could have found the defendant guilty of the essential elements of the offense beyond a reasonable doubt. *Salinas v. State*, 163 S.W.3d 734, 737 (Tex.Crim.App. 2005). A lack of direct evidence is not dispositive on the issue of the defendant's guilt; guilt may be established by circumstantial evidence alone. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex.Crim.App. 2004). We measure the evidence by the

elements of the offense as defined by a hypothetically correct jury charge. *Thomas v. State*, 303 S.W.3d 331, 333 (Tex.App.—El Paso 2009, no pet.)(*citing Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997)). A hypothetically correct charge accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the offense for which the defendant was tried. *Malik*, 953 S.W.2d at 240.

We bear in mind that the trier of fact is the sole judge of the weight and credibility of the evidence, and we must presume the fact finder resolved any conflicting inferences in favor of the verdict and we defer to that resolution. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex.Crim.App. 2014) (*citing Jackson*, 443 U.S. at 319). A reviewing court may not reevaluate the weight and credibility of the evidence or substitute its judgment for that of the fact finder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex.Crim.App. 2010). Our only task under this standard is to determine whether, based on the evidence and reasonable inferences drawn therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

Appellant was charged with possession of a controlled substance penalty group 1 (methamphetamine) in an amount of 4 grams or more but less than 200 grams. TEX.HEALTH & SAFETY CODE ANN. §§ 481.102(6), 481.115(a), (d). A person commits the offense of possession of a controlled substance if he knowingly or intentionally possesses a controlled substance, including methamphetamine. TEX.HEALTH & SAFETY CODE ANN. §§ 481.115(a), (d). To prove that Appellant possessed methamphetamine, the State was required to prove that Appellant exercised care, custody, control, or management over the methamphetamine, and he knew it was contraband. *Blackman v. State*, 350 S.W.3d 588, 594 (Tex.Crim.App. 2011); TEX.HEALTH & SAFETY CODE ANN. § 481.002(38)("'Possession' means actual care, custody, control or management.").

13

*Analysis*

In the instant case, Appellant challenges the sufficiency of the evidence on the sole basis the State did not prove beyond a reasonable doubt the identity and weight of the controlled substance he was accused of possessing. Appellant argues the State failed to present any expert testimony regarding the nature and quantity of the illegal substance he allegedly possessed, because the testimony of the laboratory technician was absent. Additionally, Appellant maintains that the State offered evidence regarding the chain of custody, but that it failed to offer any evidence regarding the laboratory results. We disagree.

The record shows the State presented evidence from which the jury could have rationally found subsequent lab testing confirmed the substance was 9.38 grams of methamphetamine and he was thus guilty of possession of a controlled substance, methamphetamine, in an amount of one gram or more but less than four grams. TEX.HEALTH & SAFETY CODE ANN. §§ 481.102(6), 481.115(a), (d).

Articles 38.41 and 38.42 of the Texas Code of Criminal Procedure govern the admissibility of certificates of analysis and chain of custody affidavits. TEX.CODE CRIM.PROC.ANN. arts. 38.41 (certificate of analysis of physical evidence); 38.42 (chain of custody affidavit). In terms of notice requirements, both Article 38.41 and Article 38.42 provide that certificates of analysis of physical evidence and chain of custody affidavits are admissible to establish the results of laboratory analysis of physical evidence conducted by or for a law enforcement agency without declarant appearing in court if the documents are filed and served on the opponent more than twenty days before trial begins and the opponent does not file a written objection by the tenth day before trial begins. *Id*. To reiterate, if a certificate of analysis complies with the requirements of Article 38.41, the certificate "is admissible in evidence on behalf of the state or the defendant to establish the

14

results of a laboratory analysis of physical evidence conducted by or for a law enforcement agency without the necessity of the analyst personally appearing in court." TEX.CODE CRIM.PROC.ANN. art. 38.41, section 1. Likewise, if a chain of custody affidavit complies with the requirements of Article 38.42, the affidavit "is admissible in evidence on behalf of the state or the defendant to establish the chain of custody of physical evidence without the necessity of any person in the chain of custody personally appearing in court." TEX.CODE CRIM.PROC.ANN. art. 38.42, section 1.

At least one month prior to trial, the State timely filed a certificate of analysis and chain of custody affidavit pursuant to Articles 38.41 and 38.42. TEX.CODE CRIM.PROC.ANN. arts. 38.41, 38.42. The certificate of analysis and chain of custody affidavit was prepared by William L. Todsen, an analyst with the Texas Department of Public Safety Abilene Regional Crime Laboratory, and it set out Todsen's duties, educational background, training, and experience. Todsen explained the lab received a 9 x 12 yellow envelope on January 28, 2019; detailed the test methods used in the analysis of the items seized in the case; contained a statement that the test methods used were scientifically approved and reliable; and indicated that a laboratory report detailing the seized items, test methods used, and analysis results was attached. The referenced laboratory report showed inside the 9 x 12 yellow envelope was a sealed plastic evidence bag containing "two ziplock 2 x 3.25" containing white crystals/crystalline powder, and the analysis of the white crystals/crystalline powder confirmed that it weighed 9.38 grams and contained methamphetamine. The record reflects that Appellant's counsel did not file written objections to the certificate of analysis and chain of custody affidavit. *See* TEX.CODE CRIM.PROC.ANN. arts. 38.41, 38.42.

On appeal, Appellant argues the State did not offer a laboratory report to prove the substance he possessed was methamphetamine and supports his position by pointing out the

15

certificate of analysis and chain of custody affidavit contained in the clerk's record does not have a laboratory report attached to it. However, at trial, the certificate of analysis and chain of custody affidavit that was admitted into evidence, without any objection from Appellant, included the laboratory report that confirmed the substance Appellant was in possession of was, in fact, 9.38 grams of methamphetamine. *See* TEX.CODE CRIM.PROC.ANN. art. 38.41 (providing that certificate of analysis is admissible to establish the results of laboratory analysis of physical evidence conducted by or for law enforcement agency without necessity of analyst's personal appearance in court). Based on this lab report, the jury could have reasonably concluded the substance Appellant possessed was methamphetamine. Because Appellant failed to timely object to the use of the certificate of analysis and chain of custody affidavit and the related laboratory report prior to trial and at trial, he waived any objection to the admission of these documents, including any complaint the State was required to call the laboratory technician to testify in person, or the State failed to comply with the requirements of Articles 38.41 and 38.42. *See Herring v. State*, No. 05-08-01699-CR, 2010 WL 1713639, at *2 (Tex.App.—Dallas Apr. 28, 2010, pet. ref'd)(not designated for publication).

Additionally, Appellant's statements and actions lend further support to the jury's findings. First, during the pat-down, when Sgt. Sawyer asked Appellant what he had in his pocket, before Appellant even took the item out of his pocket, he replied, "I'll tell you what it is. It's speed is what it is." *See Jenkins v. State*, 870 S.W.2d 626, 628 (Tex.App.—Houston [1st Dist.] 1994, pet. ref'd)(finding sufficient evidence of possession where narcotics were found inside defendant's front pants pocket); *see also Clark v. State*, No. 14-09-00944-CR, 2010 WL 4673713, at *2 (Tex.App.—Houston [14th Dist.] Nov. 18, 2010, no pet.)(mem. op., not designated for publication)("It is rational for a jury to conclude that an individual is aware of the contents of his

16

pants pocket . . . .”). Moreover, at the scene, Appellant was also found in possession of a broken pipe and a syringe, and video footage of Appellant while he sat in the police car revealed Appellant angrily stated he was going to be arrested just because he had done a “little speed.” *See Daniels v. State*, 853 S.W.2d 749, 751 (Tex.App.—Houston [1st Dist.] 1993, no pet.)(recognizing presence of crack pipe as evidence supporting jury’s conclusion that appellant intentionally possessed cocaine). Finally, when Appellant was booked at the jail, an inventory search of his property revealed he was in possession of a second baggie containing a white powdery substance found hidden in a pack of his cigarettes. *See Sneed v. State*, 875 S.W.2d 792, 795 (Tex.App.—Fort Worth 1994, no pet.)(recognizing “possession of other contraband, narcotics paraphernalia, or cutting agents” as “[f]actors that support knowing possession”).

Although Appellant testified Barker’s wife had borrowed his jacket and he was not aware of the contraband, the video footage of the stop reflects Appellant knew what was in his jacket pocket because he told the officer what it was before he took it out. Thus, the jury was free to reject Appellant’s testimony as it is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See Brooks*, 323 S.W.3d at 899.

Viewing the evidence in the light most favorable to the jury’s verdict, we conclude the State presented evidence from which the jury could have rationally found the substance Appellant possessed was 9.38 grams of methamphetamine, Appellant “exercised control, management, or care over” the substance because the plastic baggie was found in his jacket pocket, and he knew that the substance he “possessed” was contraband because of the statements he made at the scene and other items in his possession. *See Blackman*, 350 S.W.3d at 594.

The evidence is legally sufficient to support Appellant’s conviction. Issue Two is overruled.

17

## CONCLUSION

For these reasons, we affirm the trial court's judgment.

June 22, 2021

YVONNE T. RODRIGUEZ, Chief Justice

Before Rodriguez, C.J., Palafox, and Alley, JJ.

(Do Not Publish)